No. 19-3167

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

ALLISON LAMM,
Plaintiff-Appellant,

v.

DEVAUGHN JAMES,
Defendant-Appellee

_____

**APPELLANT'S OPENING BRIEF**

_____

Appeal from the Unites States District Court for the District of Kansas
(United States District Court Case No. 6:18-cv-01124-JTM)
The Honorable J. Thomas Marten
United States District Judge

_____

Aaron C. McKee, KS # 20889
MCKEE LAW, L.L.C.
222 South Cherry Street
Olathe, Kansas 66061
Phone: (913) 768-6400
Facsimile: (913) 768-6420
aaronmckee@ksmoemploymentlaw.com
Attorney for Appellant

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... 3

PRIOR AND RELATED CASES STATEMENT ...................................................... 3

I.    STATEMENT OF JURISDICTION .............................................................. 6

II.   STATEMENT OF THE ISSUES .................................................................. 6

III.  STATEMENT OF THE CASE AND FACTS ............................................... 7

IV.   SUMMARY OF ARGUMENT ................................................................... 13

V.    STANDARD OF REVIEW ........................................................................ 14

VI.   ARGUMENTS AND AUTHORITIES ....................................................... 14

A.    THE DISTRICT COURT DID NOT VIEW THE FACTS IN THE LIGHT MOST
FAVORABLE TO LAMM. ..................................................................................... 14

B.    PLAINTIFF PRESENTED DIRECT EVIDENCE OF DISCRIMINATION AND
RETALIATION ...................................................................................................... 16

C.    PHYSICAL PRESENCE IN THE OFFICE 40 HOURS PER WEEK BETWEEN
THE HOURS OF 7:00 AM AND 6:00 PM WAS NOT AN "ESSENTIAL FUNCTION".
      18

1.    No written job description showing it as an essential function. ............................... 19

2.    The only other litigation case manager was permitted to work at home and to work
at times other than 7:00 am to 6:00 pm Monday through Friday. ....................................... 19

3.    DJ's letters to candidates that did not limit work to 100% physical presence in the
office 40 hours per week between 7:00 am to 6:00 pm Monday through Friday. ............. 20

4.    The June 3, 2016 email did not say that 100% physical presence in the office or
that work was limited to 40 hours per week between 7:00 am to 6:00 pm Monday through
Friday was required. ....................................................................................................... 20

D.    DJ DID NOT ENGAGE IN THE INTERACTIVE PROCESS IN GOOD FAITH.
      21

1.    Both parties are required to work together during the interactive process to
determine if a reasonable accommodation is possible. ....................................................... 22

2.    DJ had a duty to participate in the interactive process until it identified a reasonable accommodation, or it exhausted all potential reasonable accommodations. ...................... 24

3.    The "duration" of Lamm's disability is irrelevant. ..................................................... 25

E.    LAMM WAS QUALIFIED TO PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB AT THE TIME SHE WAS TERMINATED. ....................................................... 26

i.    Lamm has an actual disability, a record of a disability and DJ perceived her as having a disability. .......................................................................................................... 26

ii.    Although expert testimony is not required to show a "disability", experts have been identified to testify about "plaintiff's disability". ................................................................ 29

iii.    Lamm was performing the essential functions of her job when she was terminated. 30

F.    SUMMARY JUDGMENT WAS NOT APPROPRIATE ON PLAINTIFF'S RETALIATION CLAIMS. ..................................................................................................... 31

G.    SUMMARY JUDGMENT WAS NOT APPROPRIATE ON PLAINTIFF'S DISPARATE TREATMENT CLAIMS. ................................................................................. 33

H.    PLAINTIFF HAS ESTABLISHED PRETEXT ........................................................ 34

VII.    CONCLUSION ............................................................................................................... 35

CERTIFICATE OF SERVICE ..................................................................................... 36

CERTIFICATE OF DIGITAL SUBMISSION ................................................... 36

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ........................... 37

ALL PERTINENT ORDERS ........................................................................ Attachment-1

JUDGMENT ................................................................................................. Attachment-2

# TABLE OF AUTHORITIES

## Cases

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000) .................................................. 19

*Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) ............................................ 25

*Blakely v. Cessna Aircraft Co.*, 256 F. Supp. 3d 1169 (D. Kan. 2017)............................. 30

*Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir.1996) ....................... 20

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)...................................... 31

*Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134 (10th Cir. 2011) ...................... 32

*Cisneros v. Wilson*, 226 F.3d 1113 (10th Cir. 2000).......................................................... 25

*Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011 (Cir. 2000)...... 20

*Criado v. IBM*, 145 F.3d 437 (1st Cir. 1998) .................................................................... 30

*Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117 (10th Cir. 2003).......................... 26

*E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981 (10th Cir. 2012)...................................... 16

*EEOC v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir.2011) .......................................... 20

*Equal Employment Opportunity Commission v. Crain Automotive Holdings LLC*, 372
    F.Supp.3d 751 (E.D. Ark. 2019)................................................................................... 15

*Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178 (10th Cir. 2016).......................... 30, 31

*Fugett v. Security Transport Services, Inc.*, 147 F.Supp.3d 1216 (D. Kan. 2015) .......... 14

*Garrison v. Dolgencorp, LLC*, 939 F.3d 937 (8th Cir. 2019) .......................................... 20

*Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877 (10th Cir. 2015) ........................... 32

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998) ................................. 19

*Hostettler v. College of Wooster*, 895 F.3d 844 (6th Cir. 2018) ....................................... 17

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562 (4th Cir. 2015) .............. 20, 27

*Jacques v. DiMarzio, Inc.*, 200 F.Supp.2d 151 (E.D.N.Y. 2002) ..................................... 20

*Johnson v. Weld Cty., Colo.*, 594 F.3d 1202 (10th Cir. 2010) ........................................ 26

*Kiel v. Select Artificials*, 142 F.3d 1077 (8th Cir. 1998) .................................................. 30

*King v. United States*, 553 F.3d 1156 (8th Cir. 2009) ........................................................ 15

*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494 (3d Cir. 1997) .............................................. 30

*Lincoln v. BNSF Railway Co.*, 900 F.3d 1166 (10th Cir. 2018)........................................ 30

*Mason v. Avaya Comms.*, 357 F.3d 1114 (10th Cir. 2004) ................................................ 16

McCord v. BNSF Ry. Co., No. 2:13-CV-2362-JTM (D. Kan.  Sept. 24, 2014).............. 19

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) ..................................... 14

*Paraham v. Atriums Management Company, Inc.*, 16-2539 (D. Kan. March 12, 2018) .. 20

*Raytheon Co. v. Hernandez,* 540 U.S. 44 (2003) .............................................................. 33

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000) ............................. 13, 14

*Rhodes v. Langston Univ.*, 462 F. App'x 773 (10th Cir. 2011)......................................... 26

*Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249 (10th Cir. 2001).................................. 30

*Summers v. Altarum Inst., Corp.*, 740 F.3d 325 (4th Cir. 2014) ...................................... 25

*Taylor v. Phoenixville School Dist.*, 184 F.3d 296 (3ʳᵈ Cir. 1999)................................... 20

*Tolan v. Cotton,* 134 S. Ct. 1861 (2014) .......................................................................... 13

*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079 (10th Cir. 2007) ............................. 31

*Winston v. Ross*, 725 F. App'x 659 (10th Cir. 2018) ....................................................... 31

**Statutes**

28 U.S.C. § 1291 ................................................................................................................... 5

28 U.S.C. § 1331 ................................................................................................................... 5

28 U.S.C. § 1367 ................................................................................................................... 5

28 U.S.C. § 1391 ................................................................................................................... 5

29 C.F.R. § 1630.1................................................................................................................ 26

29 C.F.R. § 1630.2 ................................................................................. 17, 25

29 C.F.R. § 825 ........................................................................................... 5

42 U.S.C. § 12102 ................................................................................ 25, 26

42 U.S.C. § 12111 ...................................................................................... 22

42 U.S.C.§ 12101 ........................................................................................ 5

ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ........................... 26

**Other Authorities**

DSM-V .......................................................................................................... 28

EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric
    Disabilities ............................................................................................ 27

Mental Health Conditions, NAT'L ALLIANCE ON MENTAL ILLNESS,
    https://www.nami.org/Learn-More/Mental-Health-Conditions (last visited May 26,
    2019) ..................................................................................................... 27

**Rules**

Fed. R. Evid. 201 ........................................................................................ 27

**Treatises**

10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728
    (3d ed. 1998) ......................................................................................... 14

Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the
    Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286
    (2013) ................................................................................................... 14

## PRIOR AND RELATED CASES STATEMENT

There have been no prior or related appeals.

# I.    <u>STATEMENT OF JURISDICTION</u>

Jurisdiction of the district court was invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 28 U.S.C. § 1391.  The action was authorized and instituted pursuant to The Americans with Disabilities Act, as amended ("ADA") 42 U.S.C.§ 12101 *et seq,* and the Department of Labor regulations which are found at 29 C.F.R. § 825 *et seq.*

The district court's Order Granting Defendant's Motion for Summary Judgment entered on July 10, 2019 and entered Judgment constitutes a final decision that gives this Court jurisdiction to review pursuant to 28 U.S.C. § 1291. (AA, V. IV, 907 and 942). Appellant Allison Lamm filed a timely notice of appeal on August 9, 2019. (AA, V. IV, 943).

# II.    <u>STATEMENT OF THE ISSUES</u>

A.    THE DISTRICT COURT DID NOT VIEW THE FACTS IN THE LIGHT MOST FAVORABLE TO LAMM.

B.    PLAINTIFF PRESENTED DIRECT EVIDENCE OF DISCRIMINATION AND RETALIATION.

C.    PHYSICAL PRESENCE IN THE OFFICE 40 HOURS PER WEEK BETWEEN THE HOURS OF 7:00 AM AND 6:00 PM WAS NOT AN "ESSENTIAL FUNCTION".

D.    DJ DID NOT ENGAGE IN THE INTERACTIVE PROCESS IN GOOD FAITH.

E.    LAMM WAS QUALIFIED TO PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB AT THE TIME SHE WAS TERMINATED.

F.    SUMMARY JUDGMENT WAS NOT APPROPRIATE ON PLAINTIFF'S RETALIATION CLAIMS.

G.    SUMMARY JUDGMENT WAS NOT APPROPRIATE ON PLAINTIFF'S DISPARATE TREATMENT CLAIMS.

H.    PLAINTIFF HAS ESTABLISHED PRETEXT

### III.   STATEMENT OF THE CASE AND FACTS

**A.   Lamm's Relevant Medical and Work History**

Allison Lamm ("Lamm") suffers from anxiety and mental health impairments starting in her early to late teen years. (AA Vol II, 239 at 19:13-20:3). She was most recently diagnosed with Generalized Anxiety Disorder "GAD" and panic attacks in May 2016. (AA Vol II, 441). Lamm  worked for the personal injury law firm of DeVaughn James from September of 2013 until DeVaughn James ("DJ") terminated her on June 23, 2016. (AA Vol I, 67). At the time of her termination, Lamm was a legal assistant/litigation case manager. (AA Vol I, 66).

It is undisputed that DJ was satisfied with Lamm's work until April of 2016. (AA Vol I, 205 at 225:2-11). Prior to April 2016, Lamm received positive reviews for her work performance quality and quantity and was promoted multiple times during her employment. (AA Vol II, 307-310).

Lamm has treated her GAD, panic attacks, and associated symptoms with evaluations and treatment by her primary care physician that includes prescription medications. (AA Vol II, 357, 360-367, 424-427, 430-454). She has sought counseling and therapy by a licensed counselor. (AA Vol II, 430-454). For a three-week period in Spring 2016, as a reasonable accommodation, DJ allowed Lamm time off work when she experienced severe symptoms related to her GAD and panic attacks. (AA Vol I, 160; at 45:25-46:16).

**B.   Devaughn James' Paid Time Off and Leave Policy**

DJ's paid time off (PTO) policy required employees to use paid leave for "doctor's appointments, dentist appointment's, etc.," and stated that "[t]here will be no allowances

for making up time." The policy further provided:

> If the event that you use all your PTO and go negative in PTO, you will be penalized and sent home for one (1) day without pay and [attorney owners Dustin DeVaughn] and [Richard James] will determine what day you will take off. If you continue to go negative after your day with no pay, more severe consequences will occur at the discretion of management up to and including termination.

(AA Vol II, 306).

DJ's policy made no allowances for medical leave or reasonable accommodation under the ADAAA. This strict, no exception policy penalized employees with serious health conditions requiring them to use PTO for medical conditions that could have been considered protected leave. DJ had no ADAAA policy (either written or informal), no policy on requesting reasonable accommodations or an interactive process, and it did not train its employees on the ADAAA. (AA Vol IV, 807-808 at PSOFs 9-12 and 820 at PSOFs 65-70). DJ's owners and management had little, if any, knowledge of the ADAAA, its requirements, or the protections it afforded its employees. (*Id*).

 Prior to 2016, Lamm had never exceeded the 120 hours of PTO allowed by the firm. (AA Vol II, 248 at 56:17-57:7). Richard James, DJ's 30(b)(6) representative testified that DJ did not count Lamm's anxiety absences against her PTO. (AA Vol 1, 160; at 45:25 – 46:16). Then in direct contradiction, he testified that Lamm was terminated based upon all her absences, including her "anxiety absences" (AA Vol I, 177-178 at 116:22-119:12).

DJ did not allege performance issues with Lamm during her employment, at the time of her termination, nor during the unemployment process. (AA Vol. II, 456-457, 691). However, during litigation, it began alleging Lamm had "performance issues" beginning

in April 2016. In his deposition, Richard James explicitly agreed that the only "performance issues" the firm had with Lamm was her 2016 absences, although he added as "the caveat" of "other performance issues" which included "crying at her desk" and "not getting along with other teammates." But he agreed that "her not being in the office and in attendance was the big one." (AA Vol I, 162-163 at 56:14-57:4).

## C.    Essential Functions of Litigation Case Manager

At the time of her termination, DJ had two (2) litigation case managers. (AA Vol II, 241 at 27:16-17). During litigation, DJ alleged a list of essential functions including performing all duties while physically present in the office Monday through Friday between the hours of 7:30 am and 6:00 pm. Lamm never received a written job description during her employment. (AA Vol II, 272 at 152:9-13). These "essential function" were not included in subsequent written descriptions of the position (AA Vol III, 768-769). Further, it is uncontroverted that DJ's only other litigation case manager, Velma Thompson, worked from home for up to a year, and successfully performed the essential functions of her job without being physically present in the office during normal business hours. (AA Vol I, 156 at 30:24-31:12, see also AA Vol III, 768-769). Thompson was also permitted to work at times other than between 7:00 am to 6:00 pm Monday through Friday. (AA Vol IV, 108 at DSOF 78).

## D.    Lamm's ADA Notice And Request For Accommodation

In late 2015 or early 2016, during a conversation between Lamm and Brandy Farris, DJ's Office Manager, Lamm told Farris that she was experiencing anxiety and emotional issues. (AA Vol II, 260-261 at 103:18-108:17). Lamm also began requesting time off due to anxiety and related

symptoms, including panic attacks (AA Vol. II 346-347, 428-429 and 352).

## E.    Absences

In early 2016, DJ approved Lamm's absence to attend her sister's wedding in California. (AA Vol II, 248 at 54:13-25). Prior to boarding the plane to California, Lamm suffered a severe panic attack that required an emergency room visit for evaluation and treatment. (AA Vol II, 247-248 at 53:20-54:6).

From May 10, 2016 – June 2, 2016, all Lamm's absences were due to her GAD and panic attacks. (AA Vol II, 350). DJ was aware of Lamm's mental health impairment and that her absences were related to that impairment. *See above*.  In her deposition, Lamm described her GAD and panic attack related symptoms in Spring 2016 as "shallow breathing, almost like hyperventilating", "crying uncontrollably, physically shaking, exhaustion", chest pain", "headaches" and "upset stomachs".  (AA Vol II, 239 at 18:20-19:12).

Lamm began treatment with a licensed counselor around May 15, 2016. (AA Vol II, 441). Lamm's counselor, Kristin Kroeker diagnosed her with Generalized Anxiety Disorder and panic attacks. (AA Vol II, 441). Kroeker wrote a letter, dated May 17, 2016, that Lamm provided directly to DJ. Kroeker's letter identified Lamm's mental health impairment of anxiety and panic attacks and recommended that she be able to work half days on days she experiences "intense anxiety". Kroeker also stated details and arrangements should be discussed with Lamm's HR department, included her phone number and said to call her with questions. (AA Vol II, 440).

DJ chose not to contact Kroeker or any other medical provider to make any inquiries

or gain additional information regarding Lamm's diagnoses, duration or potential reasonable accommodations. (AA Vol I, 168-169, at 77:23-82:6). Although DJ chose not to educate itself on Lamm's mental health impairments, symptoms or possible accommodations, Lamm regularly and proactively updated Brandy Farris and Richard James as to her health and related needs. (AA Vol I, 168, at 78:4-18). On June 2, 2016, Lamm advised DJ that she had been on her medications for two (2) weeks and expected them to begin working that weekend. (AA Vol III, 641).

DJ did not tell Lamm that her absences due to her mental health impairments were unreasonable or unapproved from April 2016 through June 3, 2016. (AA Vol II, 313-314, at 9:25-10:13). Further, DJ's own documents show that it understood Lamm was treating her impairment with both therapy and medication and expected improvement within a matter of weeks. (*see above*). It is uncontroverted that June 2, 2016 was the last day that Lamm missed work for anxiety or panic attacks. (AA Vol I, 175, at 107:6-20; AA Vol I, 177, at 113:15-21).

On Friday, June 3, 2016, Brandy Farris, Richard James and Dustin DeVaughn met with Lamm and issued her a warning for her anxiety-related absences. (AA Vol II, 421). During the meeting, Dustin DeVaughn suggested that Lamm take the following week off work, unpaid. Lamm did not turn down the possible week off; however, she responded stating: "I honestly don't know. I really don't know if it would solve anything or not." Lamm believed that an unpaid week off from work would have "exacerbated" her anxiety by creating additional work, stress and anxiety at work. (AA Vol I, 25-30, at 27). DJ described this meeting as disciplinary and alleged Lamm had various "performance

issues", including behavior and attitude changes. (AA Vol I, 191, at 170:4-11; 192, at 173:2-7). Lamm disputed the "performance issues". (AA Vol II, 241-243, at 27:5-37:1).

On June 7, 2016, Lamm was absent due to a family emergency. (AA Vol II, 350). DJ was aware and did not tell her it was unapproved (AA Vol II, 314 at 10:11-13). On June 21, 2016, Lamm was absent due to illness and was treated by her primary care provider. (AA Vol II, 350). Lamm let DJ know she was sick with flu like symptoms (AA Vol II, 314 at 10:14-18 and Vol II, 356). DJ made the decision to terminate Lamm on June 21, 2016. (AA Vol I, 181, at 130:15-20). Lamm was absent on June 22, 2013 for illness. On June 23, 2016, DJ told Lamm she was terminated. (AA Vol III, 666).

**F.     Unemployment benefits**

Lamm filed for unemployment benefits with the Kansas Department of Labor ("KDOL") on June 23, 2016. (AA Vol II, 454-455). On July 11, 2016, DJ submitted its response to the KDOL opposing benefits and stating it terminated Lamm for unexcused absences and "warning for anxiety absences" (AA Vol II, 456-457). DJ's opposition was signed by Dustin DeVaughn (Id.). Based on DJ's opposition, the KDOL denied Lamm's unemployment benefits finding she violated the attendance policy. (AA Vol II, 460). Lamm filed an appeal on July 29, 2016 (AA Vol II, 461). On August 17, 2016, DJ provided a second response to the KDOL removing any reference to Lamm's "anxiety" from its response (AA Vol III, 634-635). The second opposition was signed by Dustin DeVaughn. (*Id*). Later, during depositions for this case, it was revealed that Brandy Farris signed Dustin DeVaughn's name on the second opposition. (AA Vol. II 315 at 13:2-23).

On August 25, 2016, the hearing officer reversed the original decision, and found that Lamm was not disqualified. The officer concluded that the majority of Lamm's attendance

issues were due to medical reasons and Lamm's attorney made a colorable argument that her anxiety could be considered a disability under the provisions of the ADAAA and "Whether or not the employer may have needed to enter into a dialogue with the claimant and her healthcare provider to determine what reasonable accommodations it could make is not before the Appeals Referee". (AA Vol II, 462-465). DeVaughn James did not appeal the KDOL ruling. (AA Vol I, 198, at 198:23-199:1).

Lamm filed her original complaint in the United States District of Kansas on April 20, 2018 alleging discrimination and retaliation by her employer in violation of The Americans with Disabilities Act (ADA) as amended by The Americans with Disabilities Act Amendments Act of 2008 (ADAAA), 42 U.S.C. § 12101, *et seq* and retaliation in violation of the ADAAA and/or the Kansas Act Against Discrimination (KAAD), K.S.A. 44-1001, *et seq* .

Prior to trial, DJ moved for summary judgment on all claims. Lamm timely responded to the motion with sufficient facts to establish a material issue of genuine fact with respect to each of her claims.  Although the district court appeared to only address two of Lamm's claims, failure to accommodate and retaliation, the district court subsequently entered an order granting summary judgment on all claims and entered judgment in DJ's favor. (AA Vol IV, 907 and 942). Lamm timely appealed the district court's decision. (AA Vol IV, 943).

## IV.    <u>SUMMARY OF ARGUMENT</u>

An employer should not be rewarded for burying its head in the sand and choosing to avoid its legal obligations under the ADAAA. When it chooses to do so and causes

damage, then it should be held accountable. The district court applied the wrong standard to all Lamm's claims. The evidence shows that the essential functions of Lamm's job did not require that she sit in the office 40 hours per week between the hours of 7:00 am and 6:00 pm, Monday through Friday. The evidence shows that Lamm made multiple requests for accommodations. DJ was aware of Lamm's disabilities and her requests for accommodations. DJ chose not to fully engage in the interactive process to determine if her disability could be accommodated. Instead, it approved her anxiety absences, retroactively revoked that approval, and fired her for her anxiety absences. Moreover, for purposes of a retaliation claim, Lamm needs only show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

## V.     <u>STANDARD OF REVIEW</u>

This Court reviews the grant of summary judgment *de novo*, applying the same standard as the district court. *See Smothers v. Solvay Chemicals,* 740 F.3d 530, 538 (10th Cir. 2014). The Court views the facts in the light most favorable to Lamm as the non-moving party and "draw[s] all reasonable inferences" in her favor. *Tabor v. Hilti, Inc.,* 703 F.3d 1206, 1215 (10th Cir. 2013). "[A]lthough the court should review the record as a whole; it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000).

## VI.     <u>ARGUMENTS AND AUTHORITIES</u>

## A.     <u>THE DISTRICT COURT DID NOT VIEW THE FACTS IN THE LIGHT</u>

**MOST FAVORABLE TO LAMM.**

"Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed. 1998).[1]

In *Tolan*, the Supreme Court reversed the lower court because it "fail[ed] to credit evidence that contradicted some of its key factual conclusions" and "improperly 'weighed the evidence' and resolved disputed issues in favor of the moving party." *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014) (brackets omitted) (*quoting Anderson,* 477 U.S. at 249). Because the court of appeals "weigh[ed] the evidence and reach[ed] factual inferences contrary to [the nonmovant's] competent evidence," the Supreme Court vacated the court's affirmance of the district court's grant of summary judgment. *Id*. at 1868. Here, as in *Tolan*, the district court erred by failing to consider ***all of the evidence in the record*** in the ***light most favorable to Lamm***.

The district court viewed the evidence in the light most favorable to DJ on several material facts, including, but are not limited to: (1) Lamm only requested a single reasonable accommodation; (2) physical presence in the office 100% of the time for 40 hours per week between 7:00 am and 6:00 pm were essential functions; (3) Lamm violated the PTO policy; (4) Lamm did not present direct evidence of discrimination and/or retaliation; (5) Lamm did not show pretext; (6) the characterization of the meeting on June

---

[1] "[A] motion designed simply for identifying trial-worthy issues has become, on occasion, a vehicle for resolving trial-worthy issues." Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286, 312 (2013).

3, 2016; (7) the testimony from DJ's corporate representatives; (8) the characterization of

DJ's unemployment responses; (9) the characterization of Kroeker's note.

"The Court is not to weigh the credibility of witnesses at the summary judgment

stage." *Fugett v. Security Transport Services, Inc.*, 147 F.Supp.3d 1216, 1238 (D. Kan.

2015). However, "[a] fact finder is entitled to consider a party's dishonesty about a material

fact as 'affirmative evidence of guilt.'" *Reeves*, 530 U.S. at 147. The giving of evasive

testimony in response to deposition questions relating to the employer's motive for taking

the adverse employment action supports a finding of pretext. *See Mickey v. Zeidler Tool*

*& Die Co.*, 516 F.3d 516, 527 (6th Cir. 2008). The district court based many uncontroverted

facts on the corporate representative testimony of Richard James. Many of his answers

were evasive and/or unresponsive.

## B.    PLAINTIFF PRESENTED DIRECT EVIDENCE OF DISCRIMINATION AND RETALIATION.

The uncontroverted facts show that DJ terminated Lamm for "anxiety absences".

> Employer actions or remarks that reflect a discriminatory attitude, comments
> that demonstrate a discriminatory animus in the decisional process, or
> comments made by individuals closely involved in employment decisions
> may all constitute direct evidence of discrimination.

*Equal Employment Opportunity Commission v. Crain Automotive Holdings LLC*, 372

F.Supp.3d 751, 756-757 (E.D. Ark. 2019) (citing *King v. United States*, 553 F.3d 1156,

1161 (8th Cir. 2009)). Based on direct evidence of discrimination, the *McDonnell Douglas*

analysis does not apply.

"[I]n making its decision to terminate Lamm, the defendant used the entirety of her

attendance history, ***including earlier anxiety absences***." (AA, Vol. IV, 925). DJ initially

told the KDOL that it terminated Lamm for violating its PTO policy for "anxiety absences".
(AA Vol IV, 816 at PSOF 47). Then, when Lamm appealed, DJ modified its response to
remove the word "anxiety". (AA, Vol. IV, 816-817 at PSOF 50). Richard James did not
deny terminating Lamm for her anxiety related absences. (AA Vol I, 177-178 at 116:22-
119:12). Brandy Farris testified that Lamm's anxiety absences were considered in her
termination. (AA Vol II, 319 at 31:9-19).

"[H]ad Lamm not missed work on June 7, 21, and 22, 2016, she would not have
been terminated". (AA Vol IV, 925). DJ stated, "***Plaintiff was allowed to take days off
without prior notice and approval with no repercussions***."[2] (AA Vol I, 13 (emphasis
added)). DJ "admits that it terminated Plaintiff for the totality of her absences, ***including
her absences related to her mental impairment***." [AA. V. I, 190-191, at 168:16-169:1].

"Defendant allowed other employees to carry a negative PTO balance without being
terminated", including Lamm. [AA. V. II, 320-321, at 37:16-38:3].

The comments above are direct evidence of discrimination. *See Crain Automotive
Holdings LLC*, 372 F.Supp.3d at 756-757. If a jury found that Lamm is disabled, and it
believed these facts, it could draw the inference that an illegitimate criterion – ***Lamm's
disability*** – motivated her firing. These comments were not stray remarks and they were
made by the decision makers, and, these comments were not intended to preserve or
promote Lamm.

---

[2] It is also vague. A reasonable jury could conclude that DJ approved her absences on June 7, 21, and 22, then used
them as an excuse to terminate her.

Should the Court find that there is no direct evidence, then the above should be considered in the pretext analysis.

**C.** **PHYSICAL PRESENCE IN THE OFFICE 40 HOURS PER WEEK BETWEEN THE HOURS OF 7:00 AM AND 6:00 PM WAS NOT AN "ESSENTIAL FUNCTION".**

DJ was required to provide undisputed evidence that a job requirement is an essential job function. *See Mason v. Avaya Comms.*, 357 F.3d 1114, 1120 (10th Cir. 2004). Essential functions are not "marginal functions," they are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). The essential function requirement focuses on the desired *result* rather than the means of accomplishing the result. *See E.E.O.C. v. Picture People, Inc*., 684 F.3d 981, 988 (10th Cir. 2012).

DJ claims that the essential functions of Lamm's job limited her to working 40 hours per week while physically present in the office Monday through Friday between the hours of 7:00 a.m. to 6:00 p.m. (AA V. III, 572-573 at DSOF 91).  As shown below, DJ's position is untrue. DJ admits that it "***wants*** its teammates in the office when they are working" not that it needs its employees in the office. (AA V. I, 108 at 9] And, it is a "goal" to have employees in the office between 7:00 am and 6:00 pm, Monday-Friday. (AA Vol I, 156 at 32:14-19).

In *Hostettler v. College of Wooster*, the Sixth Circuit found:

> ***In sum, full-time presence at work is not an essential function of a job simply because an employer says that it is***. If it were otherwise, employers could refuse any accommodation that left an employee at work for fewer than 40 hours per week. That could mean denying leave for doctor's appointments, dialysis, therapy, or anything else that requires time away from work. Aside from being antithetical to the purpose of the ADA, ***it also***

*would allow employers to negate the regulation that reasonable accommodations include leave or telework*. 29 C.F.R. § 1630.2(o)(2)(ii).

*Wooster may have preferred that Hostettler be in the office 40 hours a week*. And it may have been more *efficient and easier* on the department if she were. But those are not the concerns of the ADA: Congress decided that the benefits of gainful employment for individuals with disabilities—dignity, financial independence, and self-sufficiency, among others—outweigh simple calculations of ease or efficiency. To that end, the ADA requires that employers reasonably accommodate employees with disabilities, including allowing modified work schedules. *An employer cannot deny a modified work schedule as unreasonable unless the employer can show why the employee is needed on a full-time schedule; merely stating that anything less than full-time employment is per se unreasonable will not relieve an employer of its ADA responsibilities*.

*Hostettler v. College of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018) (emphasis added).

1.    **No written job description showing it as an essential function.**

Lamm was never given a written job description that included a list of essential functions during her employment. (AA. V. IV, 823 at PSOF 81). Simply because DJ, after litigation has begun, says that physical attendance in the office between specific hours on specific days was an essential function of the job does not make it true.

2.    **The only other litigation case manager was permitted to work at home and to work at times other than 7:00 am to 6:00 pm Monday through Friday.**

The uncontroverted evidence shows that DJ's other litigation case manager, Velma Thompson, was permitted to work from home for nearly a year because DJ *did not have space in the office for her*. Thompson also has not been limited to working 40 hours per week in the office, Monday through Friday from 7:00 a.m. to 6:00 p.m. (AA V. I, 107 at DSOF 70 and 108 at 78). Thompson's statements in her 2016 evaluation quoted by the district court show that these were not essential functions:

- "[p]hysically being in the office to do my job" was the "***biggest unnecessary waste" of her time***.

- "The fact that I know what I do, and my total ability to do it, ***can be done from home***. *Id.* at 3.

(AA Vol III, 628-632). Although Thompson was not held to the same standard as Lamm, DJ described Velma Thompson as "a wonderful paralegal, a wonderful person, [and] very talented". (AA V. IV, 822 at PSOF 80, V. I, 156 at 28:12-29:13). Thompson had performed the litigation case manager position ***while working from home***. (AA V. I, 108 at 77).

3.     **DJ's letters to candidates that did not limit work to 100% physical presence in the office 40 hours per week between 7:00 am to 6:00 pm Monday through Friday.**

After DJ terminated Lamm, it sent a letter to individuals that applied for the "Legal Assistant/Paralegal" position. (AA V. IV, 822 at PSOF 81; V. III, 768-769). DJ did not claim that the position required 100% physical presence in the office or that work was limited to 40 hours per week between 7:00 am to 6:00 pm Monday through Friday.

4.     **The June 3, 2016 email did not say that 100% physical presence in the office or that work was limited to 40 hours per week between 7:00 am to 6:00 pm Monday through Friday was required.**

Richard James' email on June 3, 2016 specifically states, "As we discussed in the meeting, we view the paralegal job as a 40-hour week and hope that from here on out you are able to work 40 hours." (AA Vol III, 695).

Here, there are questions of fact as to the essential functions of Lamm's job. Efficiency and convenience are not significant enough to obliterate the ADAAA.[3]

---

[3] The district court's application of *McCord v. BNSF Ry. Co.* was misplaced. No. 2:13-CV-2362-JTM (D. Kan. Sept. 24, 2014). In *McCord*, the employer, BNSF, engaged in a thorough and lengthy interactive process in which numerous accommodations were considered.

D.    **DJ DID NOT ENGAGE IN THE INTERACTIVE PROCESS IN GOOD FAITH.**

A duty to accommodate arises when ***either*** a disabled employee makes a request for accommodation ***or by the employer's recognition of the need for such an accommodation***. *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000). "Once an employer's responsibility to provide reasonable accommodation is triggered, the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998) (quoting *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996)).

When an employee communicates a disability and a desire for an accommodation, the ADAAA requires the employer engage in an interactive process to identify reasonable accommodations in good faith. *See EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir.2011). The employee, however, is not required to identify a specific reasonable accommodation. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 581 (4th Cir. 2015). The failure of an employer to engage in an interactive process is prima facie evidence that the employer may be acting in bad faith. *See Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (Cir. 2000). Once DJ was on notice of Lamm's disability and that she was seeking a reasonable accommodation, DJ had an obligation to "take some initiative" to identify a reasonable accommodations. *See Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 941 (8th Cir. 2019).

An employee that is regarded as disabled can maintain suit against an employer for choosing not to reasonably accommodate. *See Paraham v. Atriums Management Company, Inc.*, 16-2539 (D. Kan. March 12, 2018); *see also Jacques v. DiMarzio, Inc.*, 200 F.Supp.2d 151 (E.D.NY. 2002).[4]

Although DJ admits to engaging in the interactive process, once in litigation, DJ claimed that it did not have to because Lamm did not request a plausibly reasonable accommodation. It would seem contrary to the purpose of the ADAAA for an employer to begin the interactive process believing that an employee had a disability, then find it cannot be liable because it had no duty to engage. The interactive process allows the employer to request information from the disabled employee so that it can investigate to determine if the employee has a disability, determine if the employee may need an accommodation, and to look for viable accommodations. As the evidence shows here, had DJ done any investigation, then it would have confirmed its perception and found that Lamm had a disability and a record of a disability.

It is uncontroverted that DJ engaged Lamm in the interactive process.

1.    <u>**Both parties are required to work together during the interactive process to determine if a reasonable accommodation is possible.**</u>

The district court found that Lamm requested only one (1) reasonable accommodation and that the requested accommodation was not plausibly reasonable. (AA,

---

[4] It is at once apparent that the employer's obligation to engage in the interactive process is certainly triggered once the ***employer regards an employee who has requested an accommodation as being disabled***. At that time the door is open for the employer to explore "what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome." *Jacques*, 200 F.Supp.2d 151 (quoting *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, (3rd Cir. 1999)).

Vol. IV, 914). And, that "The interactive process did not require the firm to dispense with an essential element of the job, or, for that matter, to contradict the explicit and essential element of her therapist's request — that *__she work only half days whenever she felt__ __anxious__*." (*Id.* (emphasis added)). These findings had no basis in the record.

Reasonable accommodations may include job restructuring, part-time or modified work schedules, reassignment to vacant position, appropriate modifications of policies. *See* 42 U.S.C. § 12111(9)(B).

DJ was on notice that Lamm was struggling with anxiety and panic attacks. Lamm spoke to Brandy Farris, multiple times. Although Lamm did not use any "magic words", Lamm discussed multiple accommodations with Farris starting in early May 2016. Each day Lamm needed to take time off for her disability, she communicated with Farris and got her approval. (AA Vol II, 346-7, 352). Farris also suggested specific medical providers and medication changes. Farris also discussed with Lamm how others at the firm dealt with their anxiety related issues. It is undisputed that Lamm kept DJ updated with her condition. (AA Vol I, 101 at DSOFs 24-25). DJ's management also was communicating amongst themselves about Lamm, yet it has produced no documents. A reasonable jury could infer that these discussions were not documented because they were to discussing terminating Lamm for her disability or for requesting accommodations.

Kroeker's letter was not an isolated request for an accommodation. The district court erroneously interpreted Kroeker's letter to be an accommodation that was plausibly not reasonable. Prior to Kroeker's letter, DJ and Lamm had been discussing Lamm's anxiety and panic attacks for a couple of weeks and allowing Lamm to leave work when she had a

panic attack. As part of the interactive process, Lamm voluntarily provided Kroeker's letter to DJ. Kroeker recommended that Lamm "be able to work half days on the days with intense anxiety, the details and arrangement of this should be discussed with your HR department." The letter further stated, "If you have any further questions, please contact me directly at 316-305-5000." (AA Vol II, 440). DJ admitted that it had the contact information for Kroeker, but it chose not to contact her.

**2.      <u>DJ had a duty to participate in the interactive process until it identified a reasonable accommodation, or it exhausted all potential reasonable accommodations.</u>**

The burden was not on Lamm to identify all potential reasonable accommodations. During the interactive process the employer is required to look for potential reasonable accommodations. As admitted by DJ, it did not. Instead, it claimed that Lamm did not ask to telework and she did not ask to work at times other than 7:00 am to 6:00 pm Monday through Friday.

DJ knew very little about the ADAAA, it had no policies on the ADAAA, it had no policies on requesting a reasonable accommodation, it did not understand the interactive process and it did not train on the ADA or its policies. (AA, Vol. IV. 820 at PSOFs 65-70. DJ did not contact any of Lamm's medical providers or do any research. (AA Vol I 168 at 77:17-78:23). Instead, once litigation started, it took the position that Kroeker's letter did not provide enough information. (AA Vol I, 101-102).

On June 3, 2016, DJ called Lamm into a meeting to discuss her absences and her work performance. The email memorializing the meeting from Richard James dated June

3, 2016 is open to several interpretations, including that DJ used this meeting to discipline Lamm as opposed to any engagement in the interactive process. (AA., Vol. III, 695).

Without deciding which party ended the interactive process, the district court suggests that Lamm ended the interactive process by advising DJ that she did not believe taking the week of June 6, 2016 off unpaid would help. Lamm had already explained that her medications should begin working. She further explained that taking a week off when it may not be necessary would further jeopardize her job. (AA Vol III, 641). DJ did not suggest any further reasonable accommodations.

A reasonable jury could infer from these facts that DJ shut down the interactive process by choosing not to suggest any further reasonable accommodations.

### 3.      The "duration" of Lamm's disability is irrelevant.

The district court further found that DJ did not know the duration of Plaintiff's disability. (AA. Vol. IV, 928). A psychological disability, such as anxiety and panic attacks, does not have a duration. However, the uncontroverted facts show that DJ offered Lamm the week of June 6, 2016 as a reasonable accommodation. It is disingenuous for DJ to say that it believed that it did not know a duration and, therefore, Lamm was asking for the ability to leave anytime indefinitely.

If Lamm was required to provide a duration, then she did. On June 2, 2016, Lamm advised DJ that she believed that her medications would begin working that weekend. (AA Vol III, 641). It is uncontroverted that after June 2, 2016, Lamm did not have another anxiety related absence. Further, Kroeker testified that she had no intention of requesting an indefinite accommodation. (AA Vol II, 398 at 34:23-35:2).

**E.     LAMM WAS QUALIFIED TO PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB AT THE TIME SHE WAS TERMINATED.**

"The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000) (overruled on other grounds by *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001)).

**i.     Lamm has an actual disability, a record of a disability and DJ perceived her as having a disability.**

DJ argues that Lamm did not have a disability.[5] However, in its Reply it admits that Plaintiff's GAD was an "impairment". [AA. V. IV, 811, Reply to PSOF 25]. "Disability" is defined by the ADA as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The ADA provides a non-exhaustive list of major life activities, including "speaking," "concentrating," "thinking," "communicating," and "working." 42 U.S.C. § 12102(2)(A). The EEOC has also identified "interacting with others" as a major life activity. 29 C.F.R. § 1630.2(i)(1)(i).

"In September 2008, Congress broadened the definition of 'disability' by enacting the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 . . ." *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014). The ADA Amendments Act (ADAAA) was intended to make it "easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). The regulation clarifies that "[t]he ***primary object of attention*** in cases brought under the ADA should be whether ***covered entities***

---

[5] DJ's position that Lamm does not have a disability seems to be contradicted by its expert disclosures. It identified Kroeker, Wilhelm and McKay as expert witnesses to testify regarding "***plaintiff's disability***".

***have complied with their obligations*** and whether discrimination has occurred, not whether the individual meets the definition of disability." *Id.*

To assert a disability within the meaning of subsection (A), "a plaintiff must 'articulate with precision' both her impairment and the major life activity it substantially limit[s]." *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1218 (10th Cir. 2010) (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003)). The Tenth Circuit has construed "the phrase 'substantially limiting' to require an impairment that renders an individual either unable or significantly restricted in ability to perform a major life activity 'compared to the average person in the general population.'" *Rhodes v. Langston Univ.*, 462 F. App'x 773, 778 (10th Cir. 2011) (quoting *Johnson*, 594 F.3d at 1218). The ADAAA includes, but is not limited to, the following in the definition of major life activity: caring for oneself, performing manual tasks, sleeping, walking, standing, lifting, bending, concentrating, and working. 42 U.S.C. § 12102(2)(A).

Lamm's Generalized Anxiety Disorder and panic attacks are recognized impairments that substantially limited her major life activities, as compared to most people in the general population, of performing manual tasks, sleeping, interacting with others, concentrating, thinking, breathing, feeling, and working. Lamm's Generalized Anxiety Disorder and panic attacks further limited the major bodily functions of her cardiovascular system, her respiratory system, gastrointestinal system and her neurological system. *See supra.*

Mental illness impacts an individual's thinking, feeling, mood, an individual's ability to relate to others and daily functions. Mental Health Conditions, NAT'L

ALLIANCE ON MENTAL ILLNESS, https://www.nami.org/Learn-More/Mental-Health-Conditions (last visited May 26, 2019). Unlike a physical impairment, a mental impairment is not the result of one event. *See id*. Genetics, environment and lifestyle influence whether someone develops a mental impairment. *See id*. The ADAAA rules define "mental impairment" to include "[a]ny mental or psychological disorder, such as . . . emotional or mental illness." Examples of "emotional or mental illness[es]" include major depression, bipolar disorder, ***anxiety disorders . . . which include panic disorder***". EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities https://www.eeoc.gov/policy/docs/psych.html (emphasis added).

On May 19, 2016, Lamm's medical provider entered notes into her chart specifically identifying her symptoms and their relation to her anxiety. (AA Vol IV 827-828 at PSOF 99). Plaintiff's counselor, Kristin Kroeker, also diagnosed Lamm with General Anxiety Disorder ("GAD") pursuant to the DSM-5.[6] (AA V. IV, 828 at PSOF 100). Kroeker testified that, in May 2016, Lamm was feeling worry, stress, an inability to sleep throughout the night, panic, night waking, hopelessness and emptiness, employment issues, and panic attacks. (AA V. IV, 830 at PSOF 103). Lamm's difficulties at work were also triggering symptoms (AA V. IV, 830 at PSOF 104).  Further, DJ has stipulated that Lamm provided it a copy of Kroeker's letter stating that Lamm was experiencing periods of intense anxiety. (AA V. IV, 831 at PSOF 108).

Lamm testified that during the Spring of 2016, she was feeling:

---

[6] Courts may take judicial notice of the DSM. Fed. R. Evid. 201." *Jacobs*, 780 F.3d at 582.

> At that time I was dealing with numerous panic attacks, and these panic attacks would consist of ***shallow breathing***, almost to like a ***hyperventilating*** state, ***crying uncontrollably***, physically ***shaking***, and that would go on for up to an hour and then it would just be absolute ***exhaustion*** after that. The other symptoms that weren't part of an actual panic attack were ***constant chest pain***, a ***constant state of on the verge of a breakdown or a panic attack***. I know I had ***upset stomachs*** during that time. ***Headaches*** were definitely more frequent. And then like I said before, just the ***exhaustion*** after all of it.

(AA V. IV, 830 at PSOF 106] (emphasis added).

At a minimum, Lamm's testimony that her anxiety and panic attacks substantially limited her in several major life activities creates a disputed issue of fact on this issue. Her testimony is also consistent with Kroeker's testimony that Lamm suffered from Generalized Anxiety Disorder within the meaning of the DSM-V.

### ii.     Although expert testimony is not required to show a "disability", experts have been identified to testify about "plaintiff's disability".

DJ argues that Lamm cannot show she is "disabled" without an expert. Lamm designated her treating medical providers, including Kroeker. DJ also chose to designate several expert witnesses. DJ disclosed Kroeker, Paul Wilhelm, MD, and Brock L. McKay, PhD as its experts. (AA V. II, 487). DJ also chose to take Kroeker's deposition. DJ further produced an expert report for McKay explaining Generalized Anxiety Disorder.

Although DJ's expert disclosures seem to concede that Lamm had a "disability", the testimony of Kroeker and the report of McKay sufficiently establish a genuine dispute of fact on whether Lamm has a disability.

Based on the evidence a reasonable jury could conclude that Lamm was substantially limited in several major life activities and thus disabled within the meaning of the ADA.

### iii. Lamm was performing the essential functions of her job when she was terminated.

As part of her prima facie case, Lamm must show that she was a qualified individual. Although the district court did not expressly state that Lamm was not qualified, it found that "The interactive process did not require the firm to dispense with an essential element of the job, or, for that matter, to contradict the explicit and essential element of her therapist's request — that she work only half days whenever she felt anxious." (AA, V. IV, 914). This finding not only mischaracterizes Kroeker's letter, but it makes inferences in the light most favorable to DJ, not Lamm.

In determining if an employee is "qualified", an employer must consider if there is a reasonable accommodation that would allow the employee to perform the essential functions of the job.

Here, DJ permitted Lamm to take time off for "anxiety absences", then retroactively revoked her previously provided accommodation and terminated her based on those same "anxiety absences".

In the light most favorable to Lamm, the uncontroverted evidence shows that DJ understood Lamm requested multiple short-term temporary accommodations to get her anxiety under control by adjusting to her medications and to begin counseling. Then, without missing any additional time after June 2, 2016 for anxiety, DJ terminated Lamm

solely for allegedly violating the attendance policy. DJ has produced no evidence, other than approved absences, showing that Lamm was not meeting the employer's legitimate expectations between June 3, 2016 and June 23, 2016. DJ has also failed to produce any evidence that it could not have reasonably accommodated Lamm.

## F.    SUMMARY JUDGMENT WAS NOT APPROPRIATE ON PLAINTIFF'S RETALIATION CLAIMS.

Plaintiff engaged in protected activity when she requested reasonable accommodations. *See Blakely v. Cessna Aircraft Co.*, 256 F. Supp. 3d 1169, 1174 (D. Kan. 2017)); *see also Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178 (10th Cir. 2016) (holding that either of plaintiff's two requests for reasonable accommodations "or a combination of both" sufficed to establish protected activity and precluded summary judgment against an ADA retaliation claim). The same requests for reasonable accommodations that comprise failure to accommodate claims can also comprise retaliation claims. *See Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, (10th Cir. 2018).

However, to prosecute an ADAAA retaliation claim, "a plaintiff need not show that she suffers from an actual disability." *Selenke v. Med. Imaging of Colo*., 248 F.3d 1249, 1264 (10th Cir. 2001). Rather, on this point, the plaintiff need only show that she had a reasonable, good-faith belief that she was disabled. *Id*.; *see also Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997).

An employer cannot penalize an employee for work missed during leave taken as a reasonable accommodation. To do so would be retaliation for the employee's use of a reasonable accommodation to which she is entitled under the law. *See Kiel v. Select*

*Artificials*, 142 F.3d 1077, 1080 (8th Cir. 1998)). Moreover, such punishment would make the leave an ineffective accommodation, thus making an employer liable for failing to provide a reasonable accommodation. *Criado v. IBM*, 145 F.3d 437, 444-45 (1st Cir. 1998).

As set forth above, DJ terminated Lamm for her "anxiety absences".

An adverse action is any action that would dissuade "a reasonable worker from making or supporting a charge of discrimination". *Winston v. Ross*, 725 F. App'x 659, 665 (10th Cir. 2018) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Lamm has identified multiple adverse actions taken by DJ against her. DJ concedes that Lamm's termination was an adverse employment action. (AA V. I, 134).

Not only did DJ terminate Lamm's employment, but, it also opposed her request for unemployment benefits citing her "anxiety absences". A reasonable employee in Lamm's shoes could find that DJ's conduct in opposing her request for unemployment benefits sufficiently adverse to dissuade someone from making or supporting a charge of discrimination. *See Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007).

Temporal proximity between Lamm's engagement in a protected activity and DJ's adverse employment actions is enough in the Tenth Circuit to infer causation. *See Foster*, 830 F.3d at 1191. Lamm was terminated June 23, 2016, within only a few weeks of notifying DJ of her mental impairments and the need for reasonable accommodations in late April/early May 2016. The proximity supports a causal connection between the protective activity and materially adverse action.

If the Court finds temporal proximity is not enough to infer causation, Lamm has shown direct evidence that DJ based its decision to terminate Lamm on her "anxiety absences". (AA. V. III, 634-635 and AA. V. III, 579 at PSOF 50; AA. V. II, 315 at 14:10-16:7). DJ's argument that Lamm had attendance issues prior to her termination shows that it did not strictly apply its attendance policy and that Lamm would not have been terminated if she had not had the "anxiety absences". Farris also testified that DJ considered Lamm's absences related to her anxiety and panic attacks in terminating her employment. (AA V. II, 315 at 14:22-16:7; 30:12-30:20). If the court does not find direct evidence, then see Pretext argument below.

Lamm, at a minimum, has shown genuine issues of material facts with respect to her retaliation claim.

## G.   SUMMARY JUDGMENT WAS NOT APPROPRIATE ON PLAINTIFF'S DISPARATE TREATMENT CLAIMS.

The trial court did not expressly dismiss Plaintiff's disability discrimination disparate treatment claims. "Defendant does not deny for purposes of this matter that they regarded plaintiff as having a disability." (AA V. IV 842-843). To establish her discrimination claims, Plaintiff needs to prove that when defendant terminated her employment, (1) she was disabled as defined by the ADAAA; (2) "[s]he was qualified, with or without reasonable accommodation, to perform the essential functions of h[er] job; and (3) [s]he was fired because of h[er] disability." *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (quoting *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011)). Disability discrimination may be proven through direct

or indirect evidence. *See Raytheon Co. v. Hernandez,* 540 U.S. 44, 49-50 & n.3 (2003). Lamm has set forth a disability under all three (3) prongs above. She further has provided direct evidence above.

"[T]here is ***substantial evidence that Lamm was in fact disabled, had a record of disability, and was regarded as disabled***." (AA V. IV, 908 (emphasis added)). The evidence viewed in the light most favorable to the Plaintiff, at the time of her termination, shows that she was satisfactorily performing the essential functions of her job. *Supra*. Plaintiff had not had any "anxiety absences" since June 2, 2016. *Supra*. The evidence further shows that, but for her "anxiety absences", Plaintiff would not have been terminated. (AA V. I, 178 at 118:5-119:12; V. III, 572 at DSOF 90; and AA V. II, 314 at 14:22-16:7; 30:12-30:20). If the court does not find direct evidence, then see Pretext argument below.

## H.    <u>PLAINTIFF HAS ESTABLISHED PRETEXT</u>

After disclosing her medical condition and requesting a reasonable accommodation, DJ began overly scrutinizing her work, her attitude and her actions. On June 3, 2016, DJ met with Lamm. James' email states, "I understood from the meeting today that you still want to work here and be part of the DeVaughn James Team". (AA V. II, 421). During the meeting DJ criticized Lamm for her "anxiety absences", blamed her for issues that were not her responsibility, criticized her for not having a positive attitude, criticized her for not participating in "extracurricular" firm activities, and criticized her for being "distanced from our firm culture". (AA V. II, 421).

Lamm was also reprimanded for using her cell phone. When questioned, she showed that it was for work. (AA. V. II, 322 at 43:3-14). Further, one of Lamm's requests for reasonable accommodation was to use her cell phone for "brain breaks" to contact her counselor or family members to control on-coming panic attacks. (AA. V. II, 322 at 43:3-14). Prior to this time, Lamm had never been reprimanded, written up or disciplined.

DJ also changed the terms and conditions of Lamm's employment. As of June 3, 2016, all of Lamm's discovery related job duties were up to date. (AA, V. II, 421). Prior to June 3, 2016, Lamm had been allowed, even trained, to ask for routine discovery extensions. (AA V. II, 273, at 156:8-18). On June 3, 2016, Lamm was told that she was no longer allowed to do so without permission from the attorney assigned in the number 1 position. (AA V. II, 421]

In the light most favorable to Lamm, a reasonable juror could conclude that DJ was looking for reasons to terminate her and her approved absences in June were a pretext.

## VII.    CONCLUSION

Lamm has shown genuine issues of material facts for all claims. For the foregoing reasons, she respectfully asks this Court to reverse the award of summary judgment and remand for further proceedings.

Respectfully submitted,

/s/ Aaron C. McKee
Aaron C. McKee                                          KS # 20889
MCKEE LAW, LLC
222 South Cherry Street
Olathe, Kansas 66061
Phone: (913) 768-6400
Facsimile: (913) 768-6420

aaronmckee@ksmoemploymentlaw.com
**ATTORNEY FOR APPELLANT**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 23, 2019 I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

Mitchell L. Herren, KS Bar #20507
Jeffrey A. Wilson, KS Bar #26527
HINKLE LAW FIRM, L.L.C.
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Office: 316-267-2000
Facsimile: 316-630-8466
Email: mherren@hinklaw.com
Email: jwilson@hinklaw.com
Attorneys for Defendant

Date: December 23, 2019

/s/ Aaron C. McKee
Aaron C. McKee                                    KS # 20889
**ATTORNEY FOR APPELLANT**

**<u>CERTIFICATE OF DIGITAL SUBMISSION</u>**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee, LiveSafe, December 23, 2019, and according to the program are free of viruses.

Date: December 23, 2019

/s/ Aaron C. McKee
Aaron C. McKee                                    KS # 20889
**ATTORNEY FOR APPELLANT**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,509 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X] this document contains 9,509 words, or

[ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Word for Office 365 in 13 point Times New Roman, or

[ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: December 23, 2019

/s/ Aaron C. McKee
Aaron C. McKee                                    KS # 20889
**ATTORNEY FOR APPELLANT**

ATTACHMENT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ALLISON LAMM,
        Plaintiff,

    vs.                          No. 18-1124-JTM

DEVAUGHN JAMES, LLC.,
        Defendant.

MEMORANDUM AND ORDER

Allison Lamm worked for the DeVaughn James law firm as one of two case managers. Lamm suffers from anxiety disorder, and in 2016 was absent from work for numerous days after experiencing panic attacks. She requested accommodation under the Americans with Disabilities Act (ADA) by being allowed to work half days. The firm refused the request, informed her of the need to schedule absences, and terminated her employment after additional absences. In the present Order, the court grants the firm's motion for summary judgment as to two key claims advanced by Lamm — that the firm failed to accommodate her disability under the ADA, and that it retaliated against her for her ADA disability request and prior anxiety-related absences.[1]

---

[1] In her Response, the plaintiff withdraws her claim that her termination violated public policy, and acknowledges that her claims under Kansas law are essentially measured under the same standard applicable to her federal discrimination claims. (Dkt. 52, at 79-80). Accordingly, the two claims at issue are the plaintiff's failure-to-accommodate and retaliation claims.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party

---

The defendant presents some argument that Lamm is not actually disabled, in part because she has not identified any experts on the issue. (Dkt. 45, at 34-39). The plaintiff disputes the claim. (Dkt. 52, at 66-72). Given the court's other findings, it is not necessary to resolve the issue. The defendant engaged in an interactive process to accommodate Lamm, and found that her only requested accommodation was not plausibly reasonable, but conflicted with an essential element of the case manager position. The defendant ultimately terminated Lamm for a legitimate business purpose. Without resolving the issue, the court notes here that there is substantial evidence that Lamm was in fact disabled, had a record of disability, and was regarded as disabled.

2

has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Lamm worked for DeVaughn James from September of 2013 until the firm terminated her employment on June 23, 2016. When she was terminated, Lamm was a legal assistant/litigation case manager for the firm. According to one of the principal attorneys of the firm, the essential functions of the litigation case manager include:

- starting and preparing pleadings;
- coordinating with firm attorneys to finalize pleadings;
- meeting with clients to go over and complete discovery such as responses to interrogatories;
- interviewing clients;
- coordinating with a firm attorney to finalize discovery responses;
- communicating with medical providers to ensure the accuracy of medical bill amounts on the firm's cases;
- scheduling depositions, meetings with experts, and court hearings;
- answering intake phone calls;
- preparing notebooks and assisting with trial preparation; and
- being in the office during regular work hours.

The requirement of being in the office Monday through Friday was not explicitly memorialized within the case manager job description.

In comparison to her previous position of prelitigation case manager, the plaintiff testified that the case manager position included "a lot more dealing with the courts and the defense counsel and their paralegals, including a lot of contact with clients, contact with defense counsel, and that kind of thing." Lamm further testified that the firm expected that a person in her position:

- handle multiple tasks at once;
- talk with clients and customers on a regular basis on the phone and sometimes meet with them in person;
- be in the office every day Monday through Friday during normal business hours;
- serve as backup to answering the phones at the office;
- interact with firm attorneys;
- coordinate with opposing counsel and courts;
- calendar deadlines;
- draft pleadings and discovery; and
- schedule meetings with experts.

The uncontroverted evidence establishes that a case manager was expected to work at least 40 hours per week, during regular office hours. Under normal business conditions, the defendant expected the case managers to perform this work at the office.

Lamm agreed in her deposition that it would be hard to coordinate with other persons during off hours, but asserted there were "a lot of my responsibilities that I could have done without needing anyone else."

Lamm knew she was expected to work 40 hours per week, Monday through Friday, between the hours of 7:00 a.m. and 6:30 p.m. She acknowledged in her deposition that she was told "repeatedly" she was not allowed to work outside of those hours. In

4

addition, she had to have at least five business days advance approval for absences. The firm informed Lamm of its attendance policies during her new-hire orientation.

Lamm was one of two litigation case managers at DeVaughn James in 2016. The other manager, Velma Thompson, worked approximately 40 hours per week at the firm office.

The firm's prelitigation case managers did not work anything other than Monday through Friday for 40 hours per week, except when the needs of a client required work on evenings or weekends.

The firm's paid time off (PTO) policy provided that employees would use paid leave for "doctor's appointments, dentist appointment's, etc.," and that "[t]here will be no allowances for making up time." The policy further provided:

> If the event that you use all your PTO and go negative in PTO, you will be penalized and sent home for one (1) day without pay and [attorney owners Dustin DeVaughn] and [Richard James] will determine what day you will take off. If you continue to go negative after your day with no pay, more severe consequences will occur at the discretion of management up to and including termination.

Lamm had attendance issues in 2015, before she began having anxiety and panic attacks. Although she did not exceed the 120 total of hours paid time off allowed by the firm, she was cautioned about her attendance.

At some point in late 2015 or early 2016, Lamm had a conversation with Brandy Farris, the firm's office manager and human resources representative. According to Lamm's version of the conversation, Farris told her "what was going on behind the scenes

with the partners and other employees." Farris discussed her own health, and that of

another worker at the firm. Because she "couldn't deal with the emotions that some of

that information would bring up," Lamm "felt like it was hindering the work" and told

Farris that she "needed to not hear all that anymore." Farris then "got really upset" and

was "almost screaming at me, crying in her office." Lamm is not sure why Farris became

upset, and remembers that Farris had also said she wasn't feeling good that day.

 Lamm does not remember exactly what she said that day, and this conversation

apparently preceded "the full-on panic attacks" she later experienced. She simply told

Farris that Farris's sharing details about firm happenings "was causing an emotional

response from me and I felt it was hindering me from doing my job because it was

extremely distracting." There is no indication that Lamm told Farris she suffered from an

anxiety disorder. The plaintiff's allegation in her Response (Dkt. 52, ¶ 7) that in this

conversation, Lamm told Farris "about her potential health impairment" and "identified

a specific trigger" is not supported by the deposition testimony.

 During the first half of 2016, Lamm had missed a total of 159.5 hours, across thirty

scheduled work days. Under its PTO policy, the firm could have refused Lamm

permission to go on a trip to San Francisco during this period. However, it allowed her

to go.

 Lamm stated in her deposition that in the Spring of 2016:

> I was dealing with numerous panic attacks, and these panic attacks would
> consist of shallow breathing, almost to like a hyperventilating state, crying
> uncontrollably, physically shaking, and that would go on for up to an hour

and then it would just be absolute exhaustion after that. The other symptoms that weren't part of an actual panic attack were constant chest pain, a constant state of on the verge of a breakdown or a panic attack. I know I had upset stomachs during that time. Headaches were definitely more frequent. And then like I said before, just the exhaustion after all of it.

After Lamm returned from her trip, she continued to miss work. Lamm's counselor, Kristin Kroeker diagnosed her as having Generalized Anxiety Disorder, and wrote a recommendation for Lamm which she gave to the firm. Kroeker wrote:

> Her symptom complex includes apprehension, chest pain, a choking or smothering sensation, insomnia, paresthesias, shortness of breath, and tachycardia. True panic attacks occur in addition to generalized anxiety. The frequency of symptoms is nearly every day. Current treatment includes counseling (started counseling w/ Kristen Kovak), a scheduled (rather than p.r.n.) benzodiazepine, and Zoloft.

Kroeker recommended that Lamm should only work half days when she experienced "intense anxiety." Kroeker also wrote that "the details and arrangement of this should be discussed with your HR department."

It is uncontroverted that Lamm requested only one accommodation for her symptoms — Kroeker's recommendation that Lamm be allowed to take half days off from work whenever she experienced intense anxiety. And Lamm in fact has testified that she does not recall requesting any specific additional accommodations.

However, in response to the summary judgment motion, the plaintiff has scoured the record to identify other events which might be considered requests for accommodation. Thus she suggests that request for accommodation are implicit in (1) her earlier requests for days off, (2) her statement that she believed her medications would

begin working by June 4 or 5, and (3), her statement that her frequent cell phone use allowed her to take "brain breaks."

As noted below, Lamm advanced the "brain breaks" theory only after she was criticized on the job for excessive cell phone use, and there is no evidence to support it as a request for an accommodation or for its medical necessity. More importantly, as with the other events now identified by the plaintiff, all of these possible accommodation requests were contradicted by her therapist, whose *explicit* and *only* suggestion was that Lamm should be allowed to work half days. Neither Kroeker, nor Lamm, ever suggested that Lamm should be allowed to work at home; the request was for Lamm, if she felt anxious, to work only a half a day.

It is uncontroverted that the firm understood the request this way, and that Lamm understood that understanding. In her handwritten notes of the June 3 meeting, Lamm recorded that the firm felt Kroeker's request was unacceptable because "they cannot 'have a paralegal that only works 25 hrs/wk." (Dkt. 45-3, at 2). In these notes, Lamm disputes some of what the firm had said at the meetings — about her falling behind and missing deadlines, but she makes no suggestion that the firm was incorrectly interpreting her request for accommodation. Indeed, she states that she did not know if a week's work of extra leave "would solve anything or not," and specifically denies making any commitment to "work 40 hrs."

Working half days, as Kroeker requested, is simply inconsistent with the plaintiff's assertion now that she was also somehow asking for additional whole days off.

8

Moreover, there is no evidence that the defendant in fact violated any such requested accommodation for whole days off. She was not terminated for taking further brain breaks, or for being absent from work for anxiety issues.

Kroeker highly encourages her patients to advocate for themselves in situations such as Lamm's. Lamm regularly updated Brandy Farris and Richard James of the firm as to her health and related needs.

Farris communicated regularly with Lamm about how she was doing, offering suggestions, and asking for updates. The plaintiff complains that the firm failed to directly contact her health care providers, but it remains uncontroverted that neither Lamm nor her doctors and therapists could inform the firm of the cause of her alleged disability or what triggered it.

DeVaughn James began litigation in many new cases in the summer of 2015, and as a result the spring of 2016 was an especially busy time for the firm. From May 18, 2016 through the end of the month, Plaintiff missed portions or all of six more days of work.

A patient with anxiety can generally expect symptoms to lessen when appropriately using medication. However, such improvement is not guaranteed. Due to the nature of general anxiety and the spontaneous nature of panic attacks, it is not possible for an employee to predict or to know, with any degree of certainty, how long she might be absent from her work office when she experiences symptoms that cause her to leave her work office.

The defendant alleges that when she was at work during this period, Lamm's work was insufficient. It states that she was obtaining discovery extensions without communicating with the case attorney, that she was on occasion seen crying at her desk, that attorneys made comments about her work being deficient, and she was not getting along with some other employees.

Lamm responds she obtained extensions the same way as Thompson, and that no one objected to how she acted until after she reported her disability. She agrees she was seen crying at her desk because she was suffering from anxiety, and notes that defendant has not offered any evidence that her productivity actually suffered because of it. She observes that the only example defendant gives of a disagreement among the employees was a mild disagreement regarding a Christmas video that Lamm was asked to help with in addition to her actual work duties. The firm points to one instance in May of 2016 in which an attorney reassigned one task (scheduling an expert witness appointment) when Lamm failed to accomplish it after two weeks.

It is otherwise undisputed that the defendant was satisfied with Lamm's work until April of 2016 — approximately the same time that she began to have anxiety-related absences. Lamm always received positive evaluations, and was promoted several times. Lamm cannot remember being told, at the time of her termination, that the defendant made any complaint as to her job performance. In his deposition, Richard James explicitly agreed that the only "performance issues" the firm had with Lamm was her 2016 absences, although he added as "the caveat" of "other performance issues" which

included "crying at her desk" and "not getting along with other teammates." But he agreed that "her not being in the office and in attendance was the big one."

On May 31, 2016, Farris sent an email to the principal attorneys stating that when Lamm had left for lunch "she said she was having a rough time" and would not be returning. On June 2, Farris emailed that Lamm was leaving early for the day. Richard James responded, "Wow! This is getting to be a problem. I would assume." Farris replied, "She said she called and got in to the doctor this afternoon to talk about changing the birth control. She has been on her other meds for 2 weeks and she thinks they should start working this weekend."

It is uncontroverted that June 2 was the last day that Lamm missed work for anxiety or panic attacks.[2]

Lamm met with the firm on Friday, June 3. A memorandum from that meeting indicates that the defendant told Lamm (1) she was falling behind and that Thompson was having to pick up the "slack," (2) her "absences are affecting Daniel [sic] move into a lead attorney position b/c he's having to do Lit thing," (3) it was "important for case mangers to be in the office Monday through Friday for 40 hours at a time," (4) it wanted "the old Allison back," and (5) she could take one week off.

---

[2] *See* Pl. Fact ¶ 95 and deft. resp. (Dkt. 55, at 51). When Lamm was absent on June 21, she texted she would not be in due to diarrhea and vomiting. But, as noted above, Lamm does not allege this condition was due to anxiety.

Lamm refused the offer of a week off, saying "I honestly don't know. I really don't know if it would solve anything or not." Lamm believed that an unpaid week off from work would have "exacerbated" her anxiety by creating additional work, stress and anxiety at work and additional stress.

Lamm told the defendant that she was timely on all discovery, and that the alleged calendaring issues were not on any cases assigned to her or her attorneys. She states that the Daniel identified in the meeting memo was a new attorney undergoing training by working as a paralegal case manager.

James has testified that by June 3, he believed Lamm's performance was unsatisfactory. Further, according to the defendant, it had not disciplined Lamm for any absences prior to June 3, 2016.

Lamm also argues that while the firm did not actually discipline her on June 3, the eventual termination was based on all of her absences, including those related to her mental impairment.

According to James, unscheduled absences create more problems for the firm than scheduled absences. The plaintiff disputes this contention, but the evidence cited — that the firm was otherwise busy and growing, and that attorneys-in-training or other personnel cannot handle paralegal duties[3] — simply shows that the damage from missed work could be mitigated, rather than non-existent.

_____

[3] The plaintiff also alleges (Dkt. 52, ¶ 41) that the defendant should have "been able to overcome any 'problems' [from] a few weeks of unscheduled absences" because it is a "high-tech" law firm. The plaintiff

Other than the Kroeker letter, Lamm did not give the firm any information on what would help her cope with her alleged disability, or what, if anything, could be changed in the office to help her cope.

It is uncontroverted that Lamm's absences after the June 3, 2016 meeting were not related to her anxiety. Following the meeting, Lamm was absent on June 7, 21, and 22.

On June 21, Lamm called Farris and said she would not be in for a couple of days because she was throwing up.

Lamm arrived for work with a doctor's note on June 23, but does not know if she gave the note to the firm. DeVaughn met with Lamm and gave her the choice or resigning or being terminated. Lamm refused to quit, and the firm terminated her employment.

Lamm has experienced anxiety-related symptoms since high school. However, at the time she was first diagnosed with anxiety disorder in the Spring of 2016, and the disorder was brought to the firm's attention, some of these episodes occurred outside the office. Some of them, such as when Lamm was observed crying at her desk, occurred in the office. Lamm continues to experience panic attacks through the present date.

Lamm filed for unemployment benefits with the Kansas Department of Labor on June 23, 2016. The Department sent the firm a July 7, 2016 notice asking for a response, and information including the reasons for termination, and the date of any warnings. The

---

cites no evidence to support her claim. More importantly, plaintiff's assertion does not controvert the defendant's asserted fact — that *unscheduled* absences are more of a burden than *scheduled* absences.

13

firm's response stated that the firm had issued a "warning for anxiety absences" on June 3, 2016. The firm later sent another response which omitted the reference to "anxiety absences," stating instead that there was a "warning issued."

Lamm spoke with the Department by telephone on July 14, 2016. Lamm stated that "the reason for being terminated was due to absences. I had received verbal warnings concerning my attendance."

The following day, the Department determined Lamm was disqualified from benefits because she was discharged for violating DeVaughn James's attendance policy. Lamm appealed, and the hearing officer reversed this decision, and held Lamm was not disqualified. The officer concluded:

> The majority of the claimant's attendance issues were due to medical reasons, and her attorney made a colorable argument that the claimant's anxiety could be considered a disability under the provisions of the Americans with Disabilities Act (ADA). A physical condition that substantially limits one or more major life activities of an individual constitutes a disability under the ADA. 42 U.S.C. Section 12102(1)(A). Whether or not the employer may have needed to enter into a dialogue with the claimant and her healthcare provider to determine what reasonable accommodations it could make is not before the Appeals Referee.

DeVaughn James did not appeal this ruling.

Lamm began working for another law firm, Joseph, Hollander & Craft (JHC), on November 28, 2016. During this employment, Lamm told her physician that she was missing work "due to 'breaking down.'" She was also under treatment for anxiety. On March 7, 2017, Rebecca Henry of Joseph, Hollander emailed its HR director and stated

"we have had major issues with [Lamm's] attendance." Lamm resigned from Joseph, Hollander on March 17, 2017.

Lamm began working at Foulston, Siefkin law firm on April 3, 2017. During that employment, Lamm continued to be treated for anxiety, and missed 25 work days. On December 6, 2017, DeAnna Reynolds of the firm emailed its HR director that "Allison's chronic absences and tardiness are way past 'becoming' a problem. She is quite unreliable, and when she is here, her mind is elsewhere." Lamm resigned from Foulston, Siefkin on January 4, 2018.[4]

Lamm has testified that she felt targeted by Farris and the principal attorneys of the defendant law firm, Dustin DeVaughn and Richard James. She does not remember whether she felt targeted by anyone before or after she began discussing her anxiety and panic attacks with DeVaughn James. Asked how she was targeted, Lamm responded she had an "overall sense of hostile environment."

As noted earlier, Lamm contends that when she obtained extensions without consulting the case attorney, she was following her training. It is uncontroverted that Lamm (and the other case manager, Thompson) were told in 2016 to  obtain extensions only after consulting with the attorney.

---

[4] Plaintiff objects to the evidence of her subsequent employment history as inadmissible character evidence. But that history is not evidence of Lamm's character, it is evidence of the extent of her anxiety disorder, and her ability to work in a law firm environment, matters which the plaintiff has put in issue. Lamm otherwise presents no evidence which would challenge the accuracy of that history.

Lamm was also told that she was on her cell phone too much at work, and that she was being monitored by a surveillance camera. As noted earlier, Lamm told the firm she was using the cell phone as a "brain break" to help with her anxiety. She states that when she was told she was using the cell phone for personal business, she showed the firm text messages showing she was using the phone for business reasons. Lamm has testified that she believes other employees were spending excessive time on their cell phones without censure. She also states that the criticism of cell phone use, and the criticism for obtaining extensions, were advanced only after she had informed the firm of her disability.

However, Lamm has admitted she has no evidence as to whether other employees were on their phones for excessive amounts of time without being reprimanded.

In 2014, DeVaughn James was going through a period of rapid growth. As a result, the office did not have enough room for all of its employees, and desks were placed in the kitchen and in hallways. The firm considered, but rejected, the idea of renting a hotel room to temporarily house its employees during the workday

The defendant has presented evidence that the case manager position was more effectively done in the office, and that the firm expected such attendance.

In her Response, Lamm relies on the experience of the other case manager, Velma Thompson, who was allowed to work from home for some period in 2014.  In particular, Lamm relies on the answers supplied by Thompson in a 2016 questionnaire given to employees. In that form, Thompson responded that "[p]hysically being in the office to do my job" was the "biggest unnecessary waste" of her time.  (Dkt. 52-3, at 1). Asked about

16

what made her love to come to work, or not want to come to work, Thompson stated: "I don't love to come to work. I would 'love' to work from home! But I've done this job for a few weeks now, and sort of know what I'm doing plus I've develop[ed] a pretty good work ethic, so, I don't mind coming to work," and that "The fact that I know what I do, and my total ability to do it, can be done from home. *Id*. at 3.

It is unclear *how long* Thompson worked from home. The defendant asserts that she was only allowed at home "a few months in 2014 due to overcrowding." (Dkt. 45, ¶ 77). But the cited excerpt from Richard James' deposition states only that Thompson "worked from home" during 2014, without indicating how long. When specifically about the issue later, James answered:

> Q.   And how long did Velma Thompson work at home?
>
> A.   Boy, I would have to look at the file, or Brandy might know…. I don't know for how long. My guess is for a period of 2014.
>
> Q.   So it was a number of months that Velma Thompson worked at home?
>
> A.   Yeah, I would characterize it in months, not years. But the exact time I don't know.

(*Id*. at 30-31). In her opposition, Lamm notes a December 2, 2014 Self-Appraisal Form by Thompson, in which she responded, when asked about the "the number one thing" the firm should consider in evaluating her, that "My work ethic and core value principles remain important to me even though I have worked from home this past year." (Dkt. 52-3, at 1).

17

It is uncontroverted that the defendant wanted its employees in the office when they are working. When Thompson worked from home, she still worked 40 hours per week between the hours of 7 a.m. and 6 p.m., and was always available on the phones or to come into the office in less than 10 minutes, with no advance notice, for an in-person meeting with a client or office staff, and often did so.

After the defendant opened its new office on January 1, 2015, the firm required Thompson to stop working at home, and she was required to work in the office  working in the office full time. At every subsequent performance review, Thompson asked for, and was denied, permission to work from home.

The defendant expressly presents as an uncontroverted fact, based upon James's deposition, that "[t]he only reason" the firm allowed Thompson to work from home in 2014 was because of a temporary shortage of office space. (Deft. Fact ¶ 83). Lamm in response cites no facts which would controvert that this was the reason for the temporary at home assignment.

There is thus evidence that Thompson would prefer to do the job at home, but the fact remains that this was a one-off event, driven by a temporary shortage of office space. It is uncontroverted that the requirement for on-site attendance is more efficient, and it's been neutrally enforced, with the firm requiring such personal attendance from both Thompson and Lamm. Further, even during the one, temporary exception created for Thompson in 2014, the case manager has never been fully allowed to "work from home," as the firm always required that Thompson come into the office on quick notice.

18

.

Only attorneys and Brandy Farris are allowed to take laptops home to do work because the firm is concerned with protecting the confidentiality of client files, and it wants its employees to be available, in person, when preparing discovery responses so they can interact, personally, with attorneys and clients in the office.

It is uncontroverted that Lamm never asked to work from home. She asked to work half days.

The defendant considers physical attendance in the office during regular business hours to be a crucial and essential part of the job for any its case managers.

The defendant's time off policy provides that if an employee uses more paid time off than they are allotted, the employee will be suspended one day without pay. Consistent with this policy, Lamm was not paid for time taken off when she had no available paid-time-off hours to use

The firm never explicitly made the decision to suspend Lamm under the time off policy. On June 21, 2016, DeVaughn James made the decision that Lamm would be terminated if she missed any more work without approval.

It is uncontroverted that, in making its decision to terminate Lamm, the defendant used the entirety of her attendance history, including earlier anxiety absences. At the same time, it is uncontroverted that, had Lamm not missed work on June 7, 21, and 22, 2016, she would not have been terminated on June 23, 2016.

The firm did not train its employees on the ADA, or have a formal ADA policy.

19

*Failure to Accommodate*

Lacking direct evidence of animus or discriminatory motivation on the part of the defendant, Lamm can support her claims only by relying on the burden-shifting framework relevant to such ADA actions. The burden-shifting test in an ADA failure to accommodate claim is distinct from that employed in traditional discrimination actions, serving as "a useful structure by which the district court, when considering a motion for summary judgment, can determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered." *Smith v. Midland Brake*, 180 F.3d 1154, 1178 n.12 (10th Cir. 1999). Under this modified framework, the employee must make an initial showing that "(1) she is disabled; (2) she is 'otherwise qualified'; and (3) she requested a plausibly reasonable accommodation." *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012). "Once the employee produces evidence sufficient to make a facial showing on ... her prima facie case, the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Smith*, 180 F.3d at 1179.

"Whether an accommodation is reasonable under the ADA is a mixed question of law and fact" that must be determined "on the facts of each case taking into consideration

the particular individual's disability and employment position." *Punt v. Kelly Services*, 862 F.3d at 1040, 1050-51 (quotation marks and citation omitted). An employer is not required to reassign the essential functions of a job to another employee in order to accommodate a disabled employee. *Frazier v. Simmons*, 254 F.3d 1247, 1261 (10th Cir. 2001). Reasonable accommodations are "those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job," and thus an employee is required to inform the employer of the "*expected duration of the impairment* (not the duration of the leave request)." *Cisneros v. Wilson*, 226 F.3d 1113, 1129–30 (10th Cir. 2000) (internal quotation marks and brackets omitted). "Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job *in the near future* and therefore whether the leave request is a 'reasonable' accommodation." *Id.* at 1130.

"[P]hysical attendance in the workplace is itself an essential function of most jobs," *Mason v. Avaya Commc'ns*, 357 F.3d 1114, 1119 (10th Cir. 2017). As a result "an employee's request to work from home" will not be considered reasonable "if the employer has decided that physical presence at the workplace is an essential function of the position." *Punt*, 862 F.3d at 1051.

In *McCord v. BNSF Ry. Co.*, No. 2:13-CV-2362-JTM, 2014 WL 4749264, at *9 (D. Kan. Sept. 24, 2014), this court held that a training coordinator's request that she "be able to remove herself from situations she found to be too stressful" was unreasonable noting authority holding that "[w]hile specific stressors in a work environment may in some

21

cases be legitimate targets of accommodation, it is unreasonable to require an employer to create a work environment free of stress and criticism." 2014 WL 4749264, at *9 (quoting *Gonzagowski v. Widnall*, 115 F.3d 744, 747–48 (10th Cir.1997)). The plaintiff offered no "specific details as to what would trigger her need for time away or how much time she would need." *Id.* The court noted that the plaintiff's request was a part of a general request for accommodation, the key part of which was plaintiff's desire "to work exclusively from home. *Id.* at *3. The plaintiff refused to participate in any on-site training for the position, which the evidence showed was an established job requirement. The court noted that "the plaintiff fail[ed] to offer any evidence that defendant allowed any of its employees to work *exclusively* from home." *Id.* at *11 (emphasis in *McCord*).

Here, Lamm presented the law firm with a request for accommodation, based upon a letter from her therapist, under which she would be able to work only half days, whenever she felt a potential panic attack coming on. There was no limitation for how long this half day work accommodation would remain in place. The most recent experience of the parties suggested that continued absences would be frequent, and the therapist's letter acknowledged that Lamm's anxiety attacks were increasing. When the firm indicated that the job required 40 hours of on-site attendance, Lamm was unable or unwilling to commit that.

The plaintiff now attempts to modify Kroeker's 2016 recommendation into something it was not. Faced with summary judgment and focusing on the therapist's recommendation that Lamm should leave when her anxiety created an "inability to

remain at work," the plaintiff attempts to transform the letter into a recommendation to work from home. But this ignores the plain language of the letter. Kroeker wrote:

> Due to your reported anxiety and your reported increase in anxiety/panic attacks, I professionally *recommend for you to be able to work half days* on the days that you experience intense anxiety during your work hours and you report your inability to remain at work due to your anxiety. I do encourage you to continue utilizing healthy coping skills discussed in our sessions to try to minimize the anxiety attacks impacting your work.

> While it is my profession *recommendation to be able to work half days* on the days with intense anxiety, the details and arrangement of this should be discussed with your HR department.

(Emphasis added). The letter thus twice explicitly recommends that when Lamm felt intense anxiety, she should work for only half a day. The letter makes no suggestion for working at home. That is a new suggestion by plaintiff, made only in the context of the present litigation, and it is one contradicted by the plain meaning of the Kroeker letter.

The plaintiff also now suggests that the firm should have accommodated her by giving her additional time for her medications to take effect. But the firm offered Lamm an additional week of leave, which she refused, indicating at the time that she was not sure the additional time would help. Further, this new suggestion is also belied by the Kroeker letter, which makes no mention of the reduced need for leave because the medication would reduce the panic attacks. Rather, the letter stressed Lamm's "reported increase in anxiety/panic attacks." Kroeker makes no suggestion that Lamm's situation would be significantly improved, and her recommendation was designed not to ensure attendance but as an attempt to "minimize the anxiety attacks impacting your work."

The requested accommodation would have been reasonably viewed as causing Lamm to be absent for many days. The plaintiff makes much of the fact that the three work days she missed in the three weeks following the June 3 meeting were not in fact caused by anxiety attacks. But, when the defendant law firm had to assess the reasonableness of the request for working only half days, it had to do so on the basis of the information available to the firm at that time. And the many absences in the preceding month suggested that Lamm would be frequently working half days, if the firm accepted the Kroeker recommendation.[5]

The plaintiff attempts to argue that on-site employment was not an essential function of her job, stressing the experience of Velma Thompson, and noting that on-site work was not expressly included in the case manager job description. The argument is unpersuasive. Although the requirement of on-site work was not expressly included in the job description, the evidence before the court confirms that DeVaughn James mandated such attendance.

As detailed previously, Thompson was allowed to work from home, but only temporarily, and only because of a temporary shortage of office space. The evidence is uncontradicted that the expansion-driven reconstruction project, and the resulting

---

[5] Just as the firm cannot be faulted for failing to foresee Lamm's attendance would significantly improve (at least during the short remainder of her employment), the reasonableness of the request is not affected by other future events, such as Lamm's unsuccessful attempts at paralegal work for other law firms. The reasonableness of the request should be assessed using only information known to the employer at the time, and, as noted above, the best information available to the defendant at the time — the recommendation of her therapist — was that Lamm's anxiety attacks were "increas[ing]" in frequency.

shortage of staff space, was the only reason Thompson was allowed to work from home.

Once that shortage was eliminated, the defendant required Thompson to work on-site.

That policy may not have been explicitly incorporated into the case manager job

description, but it is undeniably documented in Thompson's implicit complaints that she

would have preferred to work at home, but was instead forced to come into the office.

Even when Thompson was allowed to temporarily "work from home," it is

uncontradicted that the defendant frequently required her to physically go to the office

to attend meetings with clients or attorneys. That is something that Lamm – working only

half days whenever she reported an anxiety attack—would not have been able to do.  In

sum, in assessing the reasonableness of the plaintiff's requested accommodation,

Thompson's experience is irrelevant. As noted earlier, Lamm's requested

accommodation was not to work at home, but to work only half days. The uncontradicted

evidence establishes that the firm at all times considered on-site personal attendance an

essential part of the case manager position. Such attendance facilitated communication

with attorneys and clients.

The plaintiff's open-ended suggestion that she only work half days whenever she

felt anxious was unreasonable. Accordingly, the court finds that the plaintiff has not

presented a prima facie case of failure to accommodate under the ADA. The court also

finds that the defendant did in fact engage in an interactive process to attempt to

accommodate the plaintiff.

The ADA imposes upon employers a good-faith duty "to engage [with their employees] in an interactive process to identify a reasonable accommodation." *Jacobs v. N. C. Admin. Office of the Courts*, 780 F.3d 562, 581 (4th Cir. 2015). "The federal regulations implementing the ADA describe an "informal, interactive process" through which the employer and employee "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Nebeker v. Nat'l Auto Plaza*, 643 F. App'x 817, 824 (10th Cir. 2016) (citation and internal quotation omitted)).

> This interactive process encourages employers and employees to work together to identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working. An employer must make a reasonable effort to explore the accommodation possibilities with the employee. The obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee. The interactive process ensures a reasonable accommodation is identified, if one is available.

*Valdez v. McGill*, 462 F. App'x 814, 819 (10th Cir. 2012) (citations and internal quotation omitted).

The duty is "triggered when an employee communicates her disability and desire for an accommodation—even if the employee fails to identify a specific, reasonable accommodation." *Jacobs*, 780 F.3d at 581. *See also Dinse v. Carlisle Foodservice*, 541 Fed.Appx. 885, 890 (10h Cir. 2013) ("More is required to trigger an employer's duty to engage in the interactive process than mere awareness that the employee is disabled;

specifically, the employee must make an adequate request for a reasonable accommodation for the disability.").

But "the interactive process is only a means to an end. To recover under the ADA, a plaintiff must show a reasonable accommodation was possible." *Valdez*, 462 Fed.Appx. at 819 (citations and internal quotation omitted). Thus, an employer "will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position." *Jacobs*, 780 F.3d at 581. The plaintiff retains the burden of identifying a reasonable accommodation that would have permitted her to satisfy the essential functions of her job. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464–65 (4th Cir. 2012). Thus, "reasonable accommodation claims may fail where the plaintiff fails to sufficiently plead "that she could perform perhaps the most essential function of all—regularly showing up to work—with or without reasonable accommodations from defendant." *Vanyan v. Hagel*, 9 F. Supp. 3d 629, 638 (E.D. Va. 2014).

Here, DeVaughn James engaged in an interactive process with Lamm after she reported a need to work half days in light of her anxiety disorder. The firm responded by offering her an additional week off, an offer the plaintiff refused. As noted above, the request to work only half days conflicted with an essential function of the case manager position. The interactive process did not require the firm to dispense with an essential element of the job, or, for that matter, to contradict the explicit and essential element of her therapist's request — that she work only half days whenever she felt anxious.

27

*Retaliation*

To establish a prima facie case of retaliation under the ADA, the plaintiff must show "(1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) there is a causal connection between the opposition and the adverse action." *Pittman v. Am. Airlines*, 692 F. App'x 549, 552 (10th Cir. 2017). If the plaintiff presents a prima facie case of retaliation, the employer must provide a legitimate non-discriminatory reason for the adverse employment action. If it does, the plaintiff must demonstrate "at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual." *Smothers v. Solvay Chems.*, 740 F.3d 530, 538 (10th Cir. 2014). "The plaintiff may establish pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bennett v. Windstream Commc'ns*, 792 F.3d 1261, 1267 (10th Cir. 2015) (internal quotation marks omitted).

The defendant argues that Lamm's claim of retaliation should be dismissed, because she was not engaged in any protected activity. The defendant argues that merely invoking her status as disabled was not in itself a protected activity, and that the request to work half days was not protected because it was unreasonable. (Dkt. 45, at 44-45). It

also argues that even if Lamm engaged in protected activity, she was not terminated because of it, but for the legitimate business purpose of enforcing attendance policies. Further, it contends that Lamm has failed to offer evidence showing this rationale was pretext for retaliation

The court finds that the plaintiff has presented a prima facie case of retaliation for her attempt to obtain accommodation for her anxiety disorder.[6] The defendant's suggestion that a request for accommodation is a protected activity only if the request is reasonable is not supported by the authority cited. The defendant relies upon the following emphasized language from *Foster v. Mountain Coal*, 830 F.3d 1178, 1188 (10th Cir. 2016) (emphasis added):

---

[6] The court agrees with defendant that plaintiff has failed to present a prima facie claim of retaliation for actions other than her termination. Lamm alleges she was retaliated against by being overly scrutinized and "targeted," that her position was altered with respect to how case managers obtained extensions, and that the defendant opposed her application for unemployment. The court finds none of these actions materially affected her employment. The plaintiff supplies no specifics or identifies any injury with respect to the targeting, other than noting that the firm criticized her cell phone use. Lamm responded by asserting that she had been using her phone frequently to take "brain breaks," but agreed to seek other relief, and there is no evidence of any substantial burden specifically associated with having limited cell phone use. Similarly, after learning that Lamm had unilaterally obtained extensions without attorney input, the firm moved to require the two case managers to include an attorney in that decision. There is no evidence this materially increased the burden of the plaintiff's job. Generally, opposition to a request for unemployment benefits is not by itself an adverse employment action. *See Powell v. Honda of Am. Mfg.*, 2008 WL 2872273, *2 (S.D. Ohio, July 22, 2008). As noted above, the plaintiff focuses particular attention on the defendant's second response to the unemployment charge, which originally indicated that Lamm had been let go for anxiety purposes. The second response simply indicated that Lamm had been issued a warning about her absences. The court finds that, standing by itself, the second response did not materially affect Lamm's employment because (1) the response was if anything more accurate that the original, because Lamm's earlier absences were not all anxiety-driven, (2) there could not have been any real attempt to confuse the state unemployment office, which also had the defendant's original explanation, and (3) the plaintiff ultimately received benefits. The plaintiff's claim for retaliation is restricted to the contention that DeVaughn James terminated her employment after she requested an accommodation.

Many courts have evaluated the adequacy of requests for accommodation in cases involving ADA discrimination claims. *See, e.g.,* [*EEOC v.*] *C.R. Eng.*, 644 F.3d [1028,] 1048–50 [(10th Cir. 2011)]; *Taylor* [*v. Phoenixfille Sch. Dist.*], 184 F.3d [296,] 313–15 [(3d Cir. 1999)]. These cases also instruct us in evaluating the adequacy of requests for accommodation underlying retaliation claims, principally because an employee must engage in protected activity to prosecute a retaliation claim. And *an inadequate request for an accommodation – one that does not trigger an employer's duty to provide a reasonable accommodation or participate in the "interactive process" of finding an appropriate accommodation –* can never constitute protected activity. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999) ("In general, the interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations....").

But, as the remainder of *Foster* makes clear, the sole issue in that case was whether a specific request had been made, not whether the request was also plausibly reasonable for purposes of a failure-to-accommodate claim. The court concluded that the plaintiff's statement that he had surgery scheduled was protected activity, as it "'inform[ed] [Mountain Coal] of the need for an adjustment due to a medical condition.'" *Id.* at 1191 (quoting *Zivkovic v. S.Cal. Edison*, 302 F.3d 1080, 1089 (9th Cir. 2002) — without making any analysis as to whether surgery was a reasonable accommodation.

The court identified the standard for when a request for accommodation triggers protection from retaliation:

For an ADA retaliation claim, a request for accommodation is adequate if it is "sufficiently direct and specific, giving notice that [the employee] needs a special accommodation." *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004) (quotation marks omitted); *see EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011) (relying on *Calero–Cerezo*). "Although the notice or request does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' it nonetheless must make clear that the employee wants assistance for his or

30

> her disability." *C.R. Eng.*, 644 F.3d at 1049 (quotation marks and emphasis
> omitted) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir.
> 1999)); *see Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002)
> ("An employee is not required to use any particular language when
> requesting an accommodation but need only inform the employer of the
> need for an adjustment due to a medical condition." (quotation marks
> omitted)).

*Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1188 (10th Cir. 2016).

Here, Lamm gave a specific request for accommodation, and she was terminated shortly thereafter. The timing of the termination is suggestive of a retaliatory motive, and the court concludes that plaintiff has presented a prima facie case of retaliation. That the June 3 request was not itself plausibly reasonable (for reasons discussed earlier) because it conflicted with an essential element of the case manager position does not mean the request was not advanced in good faith, or was not otherwise protected activity under the ADA.

The court finds, however, that the defendant has presented a legitimate business reason for its actions. As noted earlier, the defendant considered the case manager position, of which there were only two at the firm, required personal presence on site. Such presence increases the level of communication and personal interaction between the case manager and attorneys, opposition counsel, and clients. The employer's burden of showing that its action was for a legitimate, non-discriminatory reason is "exceedingly light," *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (internal quotation marks omitted), and the defendant's proffered reason easily meets this standard.

The issue thus becomes whether DeVaughn James's rationale is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) ). "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Morgan*, 108 F.3d at 1323 (internal quotation marks and brackets omitted). The court finds the plaintiff has failed to meet this standard.

As noted earlier, the defendant has presented evidence that it expected the two case managers to be personally present at the firm's officers for 40 hours during the work week. Lamm missed a large number of absences in the Spring of 2016, some but not all of which were caused by her anxiety disorder. By the middle of 2016, Lamm had exceeded 130% of her *annual* allotment of paid time off. The defendant considered unscheduled absences particularly disruptive.

At the June 3 meeting, the defendant informed Lamm of the need to avoid such absences.  Yet within the following three weeks, Lamm missed three more days of work. Even though the absences might otherwise have been for valid reasons, they were not scheduled in advance, and thus reflected the sort of absences that the defendant was concerned with avoiding.

The plaintiff presents little reason (Dkt. 52, at 82-83) to conclude that DeVaughn James's rationale was pretext. She argues that she had been performing her job well — which was true up until the Spring of 2016. There is uncontroverted evidence, for

example, that Lamm was failing to promptly schedule witnesses, requiring reassignment of the work. Indeed, plaintiff's own therapist sent her recommendation with the hope that it would "minimize" her anxiety from further "impacting your work."

Otherwise, the plaintiff only points to the second response of the defendant to the state employment agency, and the allegedly "long and rambling answers" given by Richard James in his deposition. As to the latter, the plaintiff's conclusory assertion gives no illustration of any answer, rambling or otherwise, which would render the defendant's position unworthy of belief. The defendant's second response to the KDOL does nothing to suggest it did not consider case manager attendance important, or that it was not attempting to gain control over unscheduled absences.

The first response indicated that the defendant terminated Lamm after she had "anxiety absences." The second response does not mention "anxiety," and states instead that Lamm was terminated after a prior warning.  If anything, the second response is more accurate than the first, as the prior absences in May and earlier were not all anxiety-related, and the absences after June 3 were not related to anxiety, but had not been previously scheduled.

In sum, the court finds that the defendant, after explicitly warning the plaintiff of the need to avoid unscheduled absences, terminated Lamm after she had three additional unscheduled absences. At the time of these absences in June of 2016, Lamm had already used 130% of the paid leave she would have been entitled to for the entire year. The plaintiff has failed to point to any evidence in the record which would suggest that the

firm's stated rationale — ensuring its on site attendance for 40 hours per week —is not worthy of belief, and is a mask for retaliation.

Finally, the court denies the recent Motion to Strike (Dkt. 56) filed by Lamm, which complains that certain evidence (some documents as well as affidavits supplied by Thompson and two other persons) cited in defendant's Reply (Dkt. 55) should be barred under Fed.R.Civ.Pr. 37. The court denies the motion for two reasons. First, the cited evidence is not essential to the court's resolution of the defendant's motion. The uncontroverted facts as presented in defendant's original Memorandum (Dkt. 45) and plaintiff's response (Dkt. 52) establish defendant's right to summary judgment.

Second, the court finds any delay in violation of the rules relating to discovery would not justify the heavy sanction of striking the cited evidence. The plaintiff complains the witnesses and documents were not identified until the close of discovery (March 8, 2019). In the four months since then, the parties completed briefing on summary judgment, with the plaintiff twice obtaining extensions of time for response (Dkt. 48, 50) in light of the "heavily fact dependent inquiry" involved, without suggesting there had been any problem with the defendant's supplemental disclosures some two months earlier. In the April 16 Pretrial Order, the only discovery issue identifed by plaintiff was her objection to defendant's request for "additional employment records concerning one of Plaintiff's post-DeVaughn James' employers," and its request for plaintiff's cell phone records. (Dkt. 43, at 20). The Pretrial Order states that only the defendant intended to file any other pretrial motions. (*Id*. at 20).

34

Timely compliance with the disclosure requirements of Rule 26 is an important element of trial practice — as is the timeliness of any request for sanctioning an alleged violation. Here, the court finds nothing willful in the defendant's supplemental disclosures, and certainly no prejudice that would warrant striking the evidence from the case, as opposed to some less serious, ameliorative directive.

IT IS ACCORDINGLY ORDERED this day of July, 2019, that the defendant's Motion for Summary Judgment (Dkt. 44) is hereby granted; plaintiff's Motion to Strike (Dkt. 56) is denied.

s/ J. Thomas Marten
J. Thomas Marten, Judge

ATTACHMENT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


ALLISON LAMM,
            Plaintiff,

                                    JUDGMENT IN A CIVIL ACTION

        vs.
                                    No. 18-1124-JTM


DEVAUGHN JAMES, LLC.,
            Defendant.


        Consistent with and pursuant to the Memorandum and Order (Dkt. 57) entered
by the Court, final judgment is hereby entered in favor of defendant DeVaughn James,
LLC., and the present action is hereby dismissed, this 10th day of July, 2019.




                                    *Timothy O'Brien*
                                    Timothy O'Brien, Clerk of the Court