No. 19-3167

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

_____

ALLISON LAMM,
Plaintiff-Appellant,

v.

DEVAUGHN JAMES,
Defendant-Appellee

_____

**APPELLANT'S REPLY BRIEF**

_____

Appeal from the Unites States District Court for the District of Kansas
(United States District Court Case No. 6:18-cv-01124-JTM)
The Honorable J. Thomas Marten
United States District Judge

_____

Aaron C. McKee, KS # 20889
MCKEE LAW, L.L.C.
222 South Cherry Street
Olathe, Kansas 66061
Phone: (913) 768-6400
Facsimile: (913) 768-6420
aaronmckee@ksmoemploymentlaw.com
Attorney for Appellant

ORAL ARGUMENT IS NOT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. 2

I.    INTRODUCTION ..................................................................................................... 2

II.    ARGUMENTS AND AUTHORITIES ................................................................... 3

**1.    The world has changed and 100% physical presence in the workplace should be the exception, not the rule.** ............................................................................................ 4

**2.    DJ did not file a motion for summary judgment on Lamm's disability discrimination claim.** ................................................................................................................. 5

**3.    The law cited by DJ is unhelpful.** ...................................................................... 6

**4.    If DJ did not terminate Lamm for "anxiety absences", then it had no legitimate reason to remove the word "anxiety" from its response to the Kansas Department of Labor.** ......... 7

**5.    But for the "anxiety absences", DJ would not have terminated Lamm.** .......................... 7

**6.    Lamm was fired for 65.5 hours of "anxiety absences" over a three-week time period.** ... 8

**7.    Sick and contagious employees should not be punished for being unable to work in the office for short periods of time.** ............................................................................. 8

8.    **Lamm was qualified to perform the essential functions of the job at the time she was terminated.** ........................................................................................................ 9

**9.    DJ has produced no evidence of other employees performing Lamm's job duties.** ...... 10

**10.    Physical presence in the office 40 hours per week between the hours of 7:00 am and 6:00 pm was not an "essential function".** ............................................................... 10

**11.    The trial court incorrectly accepted as true that DJ offering Lamm the week of June 6, 2016 off unpaid as a reasonable accommodation.** ............................................... 12

**12.    DJ does not understand its duty under the ADAAA and it chose not to engage in the interactive process.** ......................................................................................... 12

**13.    DJ never told Lamm that any requested reasonable accommodations were not plausibly reasonable.** .................................................................................. 13

**14.    A reasonable jury could find that the meeting on June 3, 2016 was to "discipline" Lamm for "anxiety absences".** ........................................................................ 14

**15.    The "duration" of Lamm's disability is irrelevant.** ...................................... 14

**16.    Summary judgment was not appropriate on plaintiff's retaliation claims.** .............. 15

**17.    Plaintiff has established pretext** ................................................................. 16

**III.    CONCLUSION** ................................................................................................ 16

CERTIFICATE OF SERVICE ........................................................................................ 18

CERTIFICATE OF DIGITAL SUBMISSION .............................................................. 18

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ......................... 19

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) ................................................. 9

*Cisneros v. Wilson*, 226 F.3d 1113 (10th Cir. 2000) ........................................................... 9

*Punt v. Kelly Servs.*, 862 F.3d, 1050 ................................................................................... 6

*US Airways, Inc. v. Barnett*, 122 S. Ct. 1516, 535 U.S. 391, 152 L.Ed.2d 589, 70

U.S.L.W. 4285, (2002). ................................................................................................. 10

**Statutes**

28 U.S.C. § 1367 ................................................................................................................... 5

ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ........................... 26

**Other Authorities**

Small Employers And Reasonable Accommodation,

https://www1.eeoc.gov/eeoc/publications/accommodation.cfm?renderforprint=1 . . . . . .11

## I.    INTRODUCTION

For years, employers have denied disabled employees the full protections of the ADAAA by insisting that physical "attendance" is an "essential function". Employers violating the ADAAA use attendance as nearly an absolute defense. As shown over the last few weeks, many purported "essential functions", such as physical attendance, were not "essential". It is time for employers to recognize that technology has made physical attendance far less important.

For too long, employers, such as DJ, have done little to determine if disabled employees could be reasonably accommodated. Often, if a reasonable accommodation was

not obvious and inexpensive, it was not considered. For example, traditional keyboards can lead to carpal tunnel syndrome or repetitive strain injuries. Most employers have no problem spending $50 on an ergonomic keyboard when requested by an employee. However, instead of issuing ergonomic keyboards to all employees, most employees must first to show a disability and request a new keyboard.

DJ admitted that it took disciplinary action against Lamm for "anxiety absences". DJ admitted that it considered Lamm's "anxiety absences" as part of her termination.

The evidence shows that the essential functions of Lamm's job did not require that she sit in the office 40 hours per week between the hours of 7:00 am and 6:00 pm, Monday through Friday. The evidence shows that Lamm made multiple requests for accommodations. DJ was aware of Lamm's disabilities and her requests for accommodations. DJ chose not to fully engage in the interactive process to determine if her disability could be accommodated. Instead, it approved her anxiety absences, retroactively revoked that approval, and fired her for her anxiety absences. Moreover, for purposes of a retaliation claim, Lamm needs only show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

## II.    ARGUMENTS AND AUTHORITIES

Lamm's Opening Brief sets out several examples of the District Court failing to review and apply the facts in the light most favorable to Lamm, the non-moving party. DJ incorrectly asserts that Lamm failed to analyze these facts and set out how the Court

incorrectly applied those facts in its decision. To the contrary, Lamm spent significant time analyzing the facts and the Court's decisions based on those facts throughout her brief.

1.   **The world has changed and 100% physical presence in the workplace should be the exception, not the rule.**

DJ claims that "[h]er job duties included many activities that cannot be performed from home." (Appellee Brief at 20 citing App. Vol. 2, p. 245, 44:3-6; 44:10-17).

Recently, due to COVID-19, DJ has shown that it could operate remotely.[1] DJ's website includes the following message:

COVID-19 NOTICE:

For the safety of our clients and staff our office is currently ***closed to in-person business***. However, ***we're fully operational***, and we'll continue to offer our services via phone, email, chat or text message. If you've been injured, contact us immediately so we may start work on your case right away.



https://www.devaughnjames.com/, last visited on April 27, 2020.

If DJ could move its entire staff out of the office and become "fully operational" within a short period of time, it surely could have reasonably accommodated Lamm, but it chose not to do so.

It is uncontroverted that DJ permitted Velma Thompson, the only other litigation case manager, to work remotely for months and to work at times other than Monday through Friday from between 7:00 am to 6:00 pm. DJ has attempted to differentiate

---

[1] This would potentially create newly discovered evidence.

Thompson and Lamm. However, taking all facts and reasonable inferences in favor of Lamm, this shows that whether 100% physical presence in the office 40 hours per week between 7:00 am to 6:00 pm Monday through Friday were essential functions of the litigation case manager position should be decided by a jury.

**2.      DJ did not file a motion for summary judgment on Lamm's disability discrimination claim.**

It is uncontroverted that Lamm filed separate claims for disability discrimination, failure to accommodate and retaliation. DJ wrongly claims that Lamm did not bring a disability discrimination claim. As shown by the Pretrial Order, Plaintiff brought discrimination claims based on disparate treatment, failure to accommodate and retaliation. (A.A. Vol. 1, 76-80).

DJ was aware that Lamm had filed a disparate treatment claim. DJ's position statement to the KHRC discussed "Discrimination Based Upon Disability ***and*** Failure to Accommodate" and argued that Lamm could not prove her claims of "disability discrimination" ***or*** "failure to accommodate". In its defenses in the Pretrial Order, DJ specifically denied, "that there was any ***disparate treatment*** of Plaintiff". (A.A. Vol. 1, 81 (emphasis added)).

The problem was created by DJ. It argued the standards for a disparate treatment claim in seeking to dismiss Lamm's reasonable accommodation claim. There is no dispute that Lamm has argued that she was treated differently than other similarly situated employees, namely, Velma Thompson. Plaintiff's disability discrimination claim based on disparate treatment should be tried to a jury.

### 3.    __The law cited by DJ is unhelpful.__

DJ's reliance on *Punt* is misguided. In *Punt*, the defendants denied considering Punt's absences for her disability. *Punt v. Kelly Servs*., 862 F.3d, 1050. Here, DJ admitted that Lamm's "anxiety absences" were considered when terminating her employment.

Many other cases cited by DJ are distinguishable because, unlike here, the employers understood their obligations under the ADAAA and attempted to comply. In this case, DJ stuck its head in the sand and chose not to educate its managers or employees on the ADAAA. DJ chose not to have a written policy on the ADAAA. DJ chose not to train its owners, managers and supervisors on implementing the ADAAA. DJ chose not to train its employees on the ADAAA. DJ chose not to have a policy for employees to follow to request a reasonable accommodation.

Lamm exercised her rights under the ADAAA, informed DJ of her disability, provided detailed and timely information about her impairment, and requested numerous reasonable accommodations. Instead of looking for potential reasonable accommodations, DJ began compiling a list of reasons to get rid of her. It claimed her emotional disability was due to her boyfriend, and therefore not its problem. It claimed that it could not help because Lamm could not identify the cause of her panic attacks. It began documenting the rare occasions when someone purportedly complained about her. For example, a complaint by management when she was observed crying at her desk and a complaint about Lamm using her cell phone to communicate with an attorney (who was out of the office) about a work assignment. It had a "***disciplinary meeting***" and "warned [her] that further absences

could result in discipline." (A.A. Vol. III, 649 (emphasis added)). At no time did DJ suggest any reasonable accommodation for her.[2]

### 4. If DJ did not terminate Lamm for "anxiety absences", then it had no legitimate reason to remove the word "anxiety" from its response to the Kansas Department of Labor.

"*ANXIETY*" is the most important word in the case, yet the trial court ignored the importance of DJ altering its second response to the KDOL's "Employer Notice", excluding the word "anxiety". DJ took the position that including the word "anxiety" in its first response was a mistake or a typographical error. (AA Vol. 1, 196 at 190:4-190:20). Farris testified that she removed the word "anxiety" because she "just ran out of room." (AA Vol. II, 315 at 15:6-15:8). Removing language that would have allowed Lamm to receive her unemployment benefits and could have exposed DJ to potential ADAAA liability was not a "typographical error". On a motion for summary judgment, it must be viewed as a planned and careful attempt to mislead the KDOL and eventually the trial court.

DJ further had no legitimate reason to oppose Lamm's request for unemployment benefits. Although DJ chose not to oppose the KDOL's subsequent reversal, DJ still believes that Lamm should not have received unemployment benefits. (AA Vol. II, 316 at 31:23-32:1).

### 5. But for the "anxiety absences", DJ would not have terminated Lamm.

---

[2] DJ claims that it offered Lamm a week off without pay starting June 6, 2016. However, Richard James' testimony contradicts its position, "*I don't know that that was -- that Mr. DeVaughn was specific about a week. If it would have been a long weekend or those things*." [AA Vol. 1, 165 at 66:9-66:23 (emphasis added)].

Lamm's disability was a ***motivating factor*** in DJ's decision to terminate her. Richard James testified that Lamm was terminated based upon all her absences, including her "anxiety absences" (AA., Vol. I, 177-178 at 116:22-119:12). Farris testified that she does not know if Lamm would have been terminated without the "anxiety absences". (AA Vol. II, 318 at 28:15-28:21; AA Vol. 1, 319 at 30:12-31:5). DJ does not actually know if Lamm was in violation of the attendance policy without considering her "anxiety absences". (AA Vol. II, 318 at 28:15-28:21). For the purpose of summary judgment, it must be assumed that DJ would not have terminated Lamm but for her "anxiety absences".

**6.    Lamm was fired for 65.5 hours of "anxiety absences" over a three-week time period.**

DJ wants to be rewarded for allowing Lamm to take approximately 65.5 hours of unpaid time off for her "anxiety absences" over a three-week period. (AA Vol. II, 319 at 33:10-33:11). Here, DJ permitted Lamm to take time off for "anxiety absences", then retroactively revoked her previously provided reasonable accommodation and terminated her based on those same "anxiety absences".

**7.    Sick and contagious employees should not be punished for being unable to work in the office for short periods of time.**

Sick employees that could be contagious should stay home. At a minimum, employees should not be penalized for staying home while sick. Sick employees risk spreading illness to coworkers and clients.

Although inconsistent, DJ ultimately claims it terminated Lamm for her absences on June 22 and June 23. On June 22, 2016, Lamm advised DJ that she was sick with flu-like symptoms. DJ told Lamm to stay home. If DJ intended to terminate her for those

absences, then it should have told her that if she stayed home, then she would be fired. Instead, on June 22, 2016, DJ's leadership team met and decided to terminate Lamm. Again, but for Lamm's "anxiety absences", DJ may not have terminated her.

8. <u>**Lamm was qualified to perform the essential functions of the job at the time she was terminated.**</u>

"The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000) (overruled on other grounds by *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001)). A reasonable accommodation is an accommodation that presently ***or in the near future*** allows an individual to perform the essential functions of her job. Lamm constantly updated DJ on her progress, medications and therapy. Lamm requested reasonable accommodations, including time off. She provided information, verbally and in writing, showing that she had a disability and that she needed a short-term reasonable accommodation.

The uncontroverted evidence shows that Lamm was qualified and performing the essential functions of her job at the time of her termination. Lamm's need for a reasonable accommodation did not render her unable to perform the essential functions of her job. Lamm continued to perform the essential functions of the job, and DJ has not provided any evidence to the contrary. Once DJ decided Lamm's requested accommodations were inconvenient, it failed to consider any other accommodation.

> Q. Okay. Did you ever consider -- well, first, did you ever recommend to anyone that Allison be allowed to work maybe on the weekends or at night or at home to make up for missed time?

A. No, I did not. She didn't ask for that.

(AA Vol. II, 319 at 32:13-32:17).

DJ did not tell Lamm that she failed to perform tasks, missed deadlines, failed to meet with clients, or failed to communicate with attorneys or other "teammates". It did not terminate her for performance. (AA Vol. I at 421).

**9.    DJ has produced no evidence of other employees performing Lamm's job duties.**

DJ has claimed that other employees were performing Lamm's job duties. However, DJ has not produced any evidence showing other employees worked additional time to handle Lamm's job duties. DJ has produced no time sheets or timecards. It further did not produce any pay information showing that it paid overtime for any employees to perform Lamm's job duties. It provided no evidence that Lamm's reasonable accommodation was an undue burden.

**10.    Physical presence in the office 40 hours per week between the hours of 7:00 am and 6:00 pm was not an "essential function".**

"The simple fact that an accommodation would provide a "preference"—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, in and of itself, automatically show that the accommodation is not "reasonable." *US Airways, Inc. v. Barnett*, 122 S. Ct. 1516, 535 U.S. 391, 152 L.Ed.2d 589, 70 U.S.L.W. 4285, (2002).

> The employer may choose among reasonable accommodations as long as the chosen accommodation is effective (*i.e.*, it removes the workplace barrier at issue). The employer may offer alternative suggestions for reasonable accommodations to remove the workplace barrier in question. If there are two possible reasonable accommodations, and one costs more or is more

difficult to provide, the employer may choose the one that is less expensive or easier to provide, as long as it is effective.

[*Small Employers And Reasonable Accommodation*,

https://www1.eeoc.gov/eeoc/publications/accommodation.cfm?renderforprint=1].

DJ worked in opposition to the purpose of the ADAAA by placing workplace barriers on Lamm as a result of her request for accommodation. DJ claims that the essential functions of Lamm's job limited her to working 40 hours per week while physically present in the office Monday through Friday between the hours of 7:00 a.m. to 6:00 p.m. (AA V. III, 572-573 at DSOF 91). However, DJ admits only that it "***wants*** its teammates in the office when they are working" not that it needs its employees in the office. (AA V. I, 108) And, it is a "goal" to have employees in the office between 7:00 am and 6:00 pm, Monday-Friday. (AA Vol I, 156 at 32:14-19).

At the time DJ terminated Lamm, the evidence was that Lamm was performing the essential functions of her job. Further, DJ has increased the essential functions of the litigation case manager position for Lamm.

- "Physical attendance in the office on a predictable, full-time basis was an essential job function that Lamm could not perform." (Appellee Brief at 27).

- "Lamm was not a qualified individual because she was unable to regularly and predictably work at all in 2016." (Appellee Brief at 31).

DJ did not impose these workplace barriers on the only other litigation case manager employed with the firm, Velma Thompson, who worked at home for months. Thompson's

statements in her 2016 evaluation quoted by the district court show that these were not essential functions:

- "[p]hysically being in the office to do my job" was the "*biggest unnecessary waste" of her time*.

- "The fact that I know what I do, and my total ability to do it, *can be done from home*. *Id*. at 3.

(AA Vol III, 628-632).

11.      __The trial court incorrectly accepted as true that DJ offering Lamm the week of June 6, 2016 off unpaid as a reasonable accommodation.__

DJ asserts that it offered Lamm a week off work as a reasonable accommodation. Lamm disagrees. The "offer" was made during a disciplinary meeting that could not reasonably be considered as participation in the interactive process. Contrary to its claim, DJ has not identified a single potential reasonable accommodation for Lamm. Not only does it continue to claim that offering her to take off the week of June 6, 2016 unpaid was a reasonable accommodation, but it claims that by refusing the week off, Lamm terminated the interactive process. However, as shown by the evidence, *Lamm did not need to take off the week of June 6, 2016* for her anxiety or depression. Lamm simply needed DJ not to use her "anxiety absences" against her.

DJ offered its "reasonable accommodation" during the June 3, 2016 disciplinary meeting, and Lamm expressed concern that such an offer was not reasonable and would in fact increase her anxiety by allowing DJ to claim she was not completing her tasks. Further, Lamm missed no time from work due to her anxiety after June 2, 2016.

12.      __DJ does not understand its duty under the ADAAA and it chose not to engage in the interactive process.__

DJ complains that Lamm did not precisely request specific potential reasonable accommodations that she believed were necessary. However, DJ was required to work with Lamm to determine if she could be reasonably accommodated.

> DeVaughn James was also under no duty to provide Lamm with the specific accommodation she requested- even if it had been a request for a reasonable accommodation. *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1261 (10th Cir. 2001). Instead, employers have "broad discretion in determining which alternative accommodation should be provided." Id.

(Appellee Brief at 34-35).

DJ's assertion assumes the employer provided alternative accommodations, which it chose not to do. The goal of the ADAAA is to allow an employee with a disability to perform his or her job with or without reasonable accommodations, and in most cases an employer is in a better position than the employee to determine how it can reasonably accommodate an employee. When an employer, such as DJ, chooses not to train its employees on the ADAAA, then it should not be able to avoid liability by claiming during litigation that an employee did not make a request that was specific enough.

### 13.    <u>DJ never told Lamm that any requested reasonable accommodations were not plausibly reasonable.</u>

Lamm requested numerous reasonable accommodations. On or about May 11, 2016, Lamm began requesting and obtaining preapproval for "anxiety absences". DJ approved each of those absences. She further told DJ the reasons for each of those absences. (AA Vol. II at 350). On or about May 18, 2016, Lamm provided Farris with a copy of the note from Kroeker. (AA Vol. II at 350). The note specifically directed Lamm to discuss the accommodations with DJ's HR, which she did. However, DJ's refusal to participate in the

interactive process made such discussions irrelevant.

If DJ did not believe Lamm's requested reasonable accommodation (that it had previously agreed to) was "plausible", then as part of the interactive process it should have been required to notify Lamm before it used her "anxiety absences" to terminate her.

DJ had a duty to engage in the interactive process in good faith. However, it chose not to do so as shown by its failure to identify any reasonable accommodations and its failure to exhaust any potential accommodations.

**14.     A reasonable jury could find that the meeting on June 3, 2016 was to "discipline" Lamm for "anxiety absences".**

The meeting on Friday, June 3, 2016, was to "discipline" Lamm for "anxiety absences". The meeting was not to discuss reasonable accommodations. The documents DJ provided to the KDOL confirmed that the meeting on June 3, 2016 was to discipline Lamm. In response to Lamm's interrogatories, DJ identified the June 3 meeting as disciplinary. (AA Vol. II at 421).

DJ has been inconsistent regarding Lamm's anxiety absences. DJ stated, "***Plaintiff was allowed to take days off without prior notice and approval with no repercussions***."[3] (AA Vol I, 13 (emphasis added)). DJ also "admits that it terminated Plaintiff for the totality of her absences, ***including her absences related to her mental impairment***." (AA. V. I, 190-191, at 168:16-169:1).

**15.     The "duration" of Lamm's disability is irrelevant.**

---

[3] A reasonable jury could conclude that DJ approved her absences on June 7, 21, and 22, then used them as an excuse to terminate her.

The district court further found that DJ did not know the duration of Plaintiff's disability. (AA. Vol. IV, 928). A psychological disability, such as anxiety and panic attacks, does not have a "duration". If Lamm was required to provide a duration of when she expected to return full-time, then she did. On June 2, 2016, Lamm advised DJ that she believed that her medications would begin working that weekend. (AA Vol III, 641). It is uncontroverted that after June 2, 2016, Lamm did not have another anxiety related absence. Further, Kroeker testified that she had no intention of requesting an indefinite accommodation. (AA Vol II, 398 at 34:23-35:2).

Additionally, Lamm was in constant communication with DJ about her disability. If DJ believed that Lamm was requesting anything other than a short-term accommodation, then certainly it would have told its "teammate" that it could not accommodate her.

### 16.    <u>Summary judgment was not appropriate on plaintiff's retaliation claims.</u>

As discussed fully in Lamm's Opening Brief, the Court erred in granting summary judgment on her retaliation claim. Lamm has met all the elements. Additionally, Lamm presented both direct and indirect evidence in support of her claim. DJ's first response to the KDOL was direct evidence of its discrimination and retaliation against Lamm for her "anxiety absence". (AA Vol. II at 456). Its second response to the KDOL is indirect evidence of the same. (AA Vol. III at 634).

Lamm, at a minimum, has shown genuine issues of material facts with respect to her retaliation claim.

### 17.     <u>Plaintiff has established pretext</u>

After disclosing her medical condition and requesting a reasonable accommodation, DJ began overly scrutinizing her work, her attitude and her actions. On June 3, 2016, DJ conducted a disciplinary meeting with Lamm. During the meeting, DJ criticized Lamm for her "anxiety absences", blamed her for issues that were not her responsibility, criticized her for not having a positive attitude, criticized her for not participating in "extracurricular" firm activities, and criticized her for being "distanced from our firm culture". (AA V. II, 421).

DJ also changed the terms and conditions of Lamm's employment. As of June 3, 2016, all of Lamm's discovery related job duties were up to date.  (AA, V. II, 421). Prior to June 3, 2016, Lamm had been allowed, even trained, to ask for routine discovery extensions. (AA V. II, 273, at 156:8-18). On June 3, 2016, Lamm was told that she was no longer allowed to do so without permission from the attorney assigned in the number 1 position. (AA V. II, 421]

In the light most favorable to Lamm, a reasonable juror could conclude that DJ was looking for reasons to terminate her and her approved absences in June were a pretext.

### III.     <u>CONCLUSION</u>

Lamm has shown genuine issues of material facts for all claims. For the foregoing reasons, she respectfully asks this Court to reverse the award of summary judgment and remand for further proceedings.

Respectfully submitted,

/s/ Aaron C. McKee
Aaron C. McKee                                    KS # 20889
MCKEE LAW, LLC
222 South Cherry Street
Olathe, Kansas 66061
Phone: (913) 768-6400
Facsimile: (913) 768-6420
aaronmckee@ksmoemploymentlaw.com
**ATTORNEY FOR APPELLANT**

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2020 I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

Mitchell L. Herren, KS Bar #20507
Jeffrey A. Wilson, KS Bar #26527
HINKLE LAW FIRM, L.L.C.
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Office: 316-267-2000
Facsimile: 316-630-8466
Email: mherren@hinklaw.com
Email: jwilson@hinklaw.com
Attorneys for Defendant

Date: April 27, 2020

/s/ Aaron C. McKee
Aaron C. McKee                                    KS # 20889
**ATTORNEY FOR APPELLANT**

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the

most recent version of a commercial virus scanning program, McAfee, LiveSafe, April 27, 2020, and according to the program are free of viruses.

Date: April 27, 2020

/s/ Aaron C. McKee
Aaron C. McKee                                        KS # 20889
**ATTORNEY FOR APPELLANT**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4541 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X] this document contains 4541words, or

[ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Word for Office 365 in 13-point Times New Roman, or

[ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: April 27, 2020

/s/ Aaron C. McKee
Aaron C. McKee                                        KS # 20889
**ATTORNEY FOR APPELLANT**